**UNITED STATES of America**

v.

**Peter Vincent DOUGLAS, et al., Defendants.**

**Civ. A. No. 85–436–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 5, 1985.

Russell B. Kinner, Michael F. Hertz, Robert L. Ashbaugh, Dept. of Justice, Civ. Div., Washington, D.C., Raymond A. Jackson, Asst. U.S. Atty., Norfolk, Va., for plaintiffs.

William O. Snead, III, Cremins, Snead & Annunziata, Fairfax, Va., Stanley E. Sacks, Sacks, Sacks & Larkin, Norfolk, Va., for Emory Worth Brown, Jr.

Edward M. Medvene, Ronald A. DiNicola, Patricia H. Benson, Mitchell, Silberberg & Knupp, Los Angeles, Cal., Herbert J. Miller, Jr., Jonathan B. Sallet, Miller, Cassidy, Larroca & Lewin, Washington, D.C., Thomas B. Carr, Fairfax, Va., for Peter Vincent Douglas and The Bryna Corp.

Jerrold G. Weinberg, Ann K. Crenshaw, Weinberg & Stein, Norfolk, Va., Nils Victor Montan, Ward, Lazrus, Grow & Cihlar, Washington, D.C., for Morrison Finance Ltd. & Aspen Productions.

## MEMORANDUM ORDER

CLARKE, District Judge.

Plaintiff, the United States of America, brought this action seeking $691,105 in damages from five defendants as a result of an allegedly false report submitted to the Navy in connection with the Navy's participation in the making of the film "The Final Countdown."

A number of motions have been filed by the defendants. Defendant Cmdr. Emory Worth Brown, Jr., who allegedly submitted the false report, has filed a Motion to Dismiss and a Motion for a More Definite Statement of plaintiff's claim against him. The remaining four defendants, Peter Vincent Douglas, The Byrna Company, Morrison Finance, Ltd. and Aspen Productions, (the "filmmaker defendants") have filed a motion to dismiss on jurisdiction and venue grounds, a motion to transfer the action to the Central District of California under 28 U.S.C. § 1404(a), and a motion to dismiss Count II of plaintiff's complaint. Briefs have been submitted by all the parties and a hearing held on these motions. Accordingly, these issues are ripe for disposition.

### FACTS

The facts of this case may be summarized as follows. The filmmaker defendants sought and received the cooperation of the Navy in the filming of "The Final Countdown," a movie which depicted the transportation back in time of a modern nuclear powered aircraft carrier to a position near Pearl Harbor just prior to the Japanese attack.

In accordance with an agreement between the Navy and the filmmaker defendants reached before the filming began, the Navy was to be reimbursed for certain costs related to its participation, including costs associated with flying scenes filmed using Navy F–14 aircraft. Initially, it was anticipated that thirty hours of flying time would be required, and that the Navy would be reimbursed at a rate of $1,200.00 per hour. This rate was adjusted to $4,126.00 per hour before filming began.

At the time of the filming, defendant Brown was commander of the squadron of F–14 aircraft used to fly scenes for the movie and to requisition military items for use in the movie. In June and July of 1979 the filmmakers filmed movie scenes involving Navy personnel and equipment, with this filming taking place both in and near Norfolk and off the coast of Florida using F–14 aircraft ferried daily to and from Oceana Naval Air Station in Virginia Beach. During this period, it is alleged that Navy fighters were requested by the filmmakers to fly, and did fly, 200 hours in support of the movie. Defendant Brown, however, who was assigned the responsibility of accounting for all hours flown by his squadron in support of the movie, reported that only 32.5 hours were flown in support of the movie.

### DEFENDANT BROWN'S MOTION TO DISMISS

The Court first turns to defendant Brown's motion to dismiss. Brown raises a

number of issues, the essence of which is his contention that plaintiff's claim against him sounds in tort, and not in contract, and is thus barred by the three year statute of limitations on tort claims because it arose over five years ago.

Dismissal for failure to state a claim is appropriate only "when it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Such is not the case here. The plaintiff alleges that Brown breached his fiduciary duty owed to the government. This duty, alleged to arise out of a contract implied in law between the government and its employees, *Jankowitz v. United States*, 533 F.2d 538, 548 (Ct.Cl.1976), would have been breached by Brown's alleged misreporting of the flight hours he was responsible for tracking. As the statute of limitations applicable to an action by the United States on a contract implied in law is six years, 28 U.S.C. § 2415(a), this action is not time barred.

Whether Brown may ultimately be held liable for $691,105.00, however, presents a more difficult question. Counsel for Brown has argued that Brown's liability must be limited to the payments of over $6,300.00 and other benefits he allegedly personally received, as opposed to the total damages suffered by the government as a result of his actions. The Court need not reach that question at this time, however, as it is sufficient for the purposes of F.R. C.P. 12(b)(6) that the plaintiff has alleged facts that would allow it to recover some damages on its breach of fiduciary duty claim against Brown. *United States v. Carter*, 217 U.S. 286, 306, 30 S.Ct. 515, 520, 54 L.Ed. 769 (1910).

## BROWN'S MOTION FOR A MORE DEFINITE STATEMENT OF THE CLAIMS AGAINST HIM

Brown's contention that the plaintiff's complaint does not sufficiently notify him of the facts underlying the claims against him is simply without merit. To the contrary, paragraphs 7, 15, 18, 19, 25, 30 and 31 of the complaint allege in great detail the facts surrounding the breach of fiduciary duty claim. Plaintiff is, of course, entitled to learn more about plaintiff's claims through the normal process of discovery.

## FILMMAKER'S MOTION TO DISMISS ON JURISDICTION GROUNDS

■ The filmmaker defendants initial jurisdictional contention is that the Court has no *in personam* jurisdiction over them. The section of Virginia's long-arm statute on which plaintiff's claim of personal jurisdiction is based reads as follows:

A. A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:

1. Transacting any business in this Commonwealth.

Va.Code Ann. § 8.01–328.1.

Consistent with the broad readings of the jurisdictional reach of this statute given by the Supreme Court of Virginia, it has been held that one act of transacting business committed in Virginia by a non-resident may be sufficient to bring the non-resident within the jurisdictional reach of the Court. Jurisdiction will exist with respect to a cause of action arising from the business transaction "if by that one act the non-resident can be said to have engaged in some purposeful activity in Virginia." *Viers v. Mounts*, 466 F.Supp. 187, 190 (W.D.Va. 1979). The requirement of purposeful activity in Virginia serves the purpose of ensuring that the constitutional requirements of due process are met, namely, that the defendants have certain "minimum contacts" with the forum state which evince their "[purposeful availment] of the privilege of conducting activities within the forum state...." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

The Court need not delve into the complexities of the due process limitations on state long-arm jurisdiction, however, as the

quantity, quality, and nature of the film-maker defendants' contacts with the Commonwealth are more than sufficient to meet the constitutional standard. The most significant of these contacts, which are based primarily on sworn testimony from defendant Brown's criminal trial, *United States v. Brown*, Criminal Action Nos. 83–10–N, 83–11–N (E.D.Va., Apr. 21–28, 1983), are:

(1) Mr. Douglas traveled to Virginia to initiate the cooperation of the Navy with the filmmakers;

(2) The filmmakers established a Norfolk, Virginia office to coordinate cooperation with the Navy;

(3) The filmmakers established a corporate bank account in Norfolk in connection with the production of the film;

(4) The filmmakers conducted filming in Virginia; and additional filming took place in Florida using naval aircraft ferried daily to and from the Virginia Beach area;

(5) The filmmakers purchased materials from merchants in the Norfolk area for the production of the film;

(6) Executives travelled to the Norfolk area to coordinate the filming;

(7) The filmmakers leased accommodations for their employees in Virginia;

(8) The filmmakers had written and telephonic communications with Virginia based Naval personnel in connection with the production of the film.

In short, these defendants clearly demonstrated their intent to avail themselves of the benefits and protections of the laws of Virginia through their extensive film operations in connection with the filming of "The Final Countdown." It is thus hardly unfair to subject these defendants to suit in Virginia.

■ The filmmaker defendants second jurisdictional contention is that venue in the Eastern District of Virginia is improper. Under the federal venue statute, "a civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all the defendants reside, or in which the claim arose, except as otherwise provided by law." 28 U.S.C. § 1391(b). As the four filmmaker defendants reside in California, venue is proper in the Eastern District of Virginia only if the claim arose here.

The defendants correctly point out that the purpose of the venue statutes is to protect the defendant against the risk that a plaintiff will select an "unfair or inconvenient place of trial." *Leroy v. Great Western United Corp.*, 443 U.S. 173, 184, 99 S.Ct. 2710, 2716, 61 L.Ed.2d 464 (1979). The Eastern District of Virginia, however, is not an unfair place of trial given the scope and quality of the contacts the filmmaker defendants had with Virginia that were directly related to the filming.

This Court recognizes that the tests used to determine the propriety of venue differ somewhat from those tests used in examining questions of personal jurisdiction. Three recent district court decisions from within the Fourth Circuit have reviewed in great detail the caselaw and commentary interpreting the "claim arose" language in the federal venue statutes. *Safeco Ins. Co. of America v. Miller*, 591 F.Supp. 590 (D.Md.1984); *United Coal Co. v. Land Use Corp.*, 575 F.Supp. 1148 (E.D.Va.1983); *Hodson v. A.H. Robins Co.*, 528 F.Supp. 809 (W.D.Va.1981), *aff'd*, 715 F.2d 142 (4th Cir.1983). Each has noted that the Fourth Circuit Court of Appeals has not yet prescribed which of the available tests should be used in analyzing venue under 28 U.S.C. § 1391(b), but each has gone on to apply a "weight of contacts" or "substantial contacts" test. *E.g.*, *Safeco*, 591 F.Supp. at 595.

■ This Court agrees that a substantial contacts test should be used to determine whether venue is proper. Under this test, the plaintiff must show that a substantial part of the events giving rise to the claim occurred in the district. Thus, neither the place of performance nor the place of contracting are dispositive as to the propriety of venue. Rather, the circumstances of the transaction as a whole must be looked at to

ascertain the place or places that are so closely connected with the claim as to provide a fair and convenient trial location.

A review of the facts shows that some of the contractual negotiations and most of the contractual performance took place in Virginia. The majority of government witnesses and the bulk of the government's documentary evidence are also found in this district. Although most of the filmmaker defendants' non-party witnesses and documentary evidence are located in California, factors that also will be considered in relation to defendants' motion to transfer this case to the Central District of California, the Court is of the opinion that the balance of the convenience and fairness factors support the conclusion that venue is proper in this district. If it was fair for these defendants to come into the Commonwealth on this money-making venture, it is also fair for them to defend a suit in Virginia arising from that venture.

### FILMMAKER'S MOTION TO TRANSFER THIS ACTION

■ Having found that the Court has jurisdiction over the filmmaker defendants and that venue is proper in this district, the Court now turns to the filmmaker defendants' motion to transfer the action to the Central District of California under 28 U.S.C. § 1404(a).

Section 1404(a) reads as follows:

For the convenience of the parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Because § 1404(a) requires that the transferee district be one where the action could have been brought originally, a preliminary issue is whether this action could have been brought in its current form in the Central District of California. Plaintiff argues that the action could not be brought in its present configuration in that district because defendant Brown would not be subject to the *in personam* jurisdiction of that Court, nor would he be amenable to service of process there. The filmmaker defend-

ants contend that Brown would be within the jurisdictional reach of the California Court, but base this contention on one trip Brown made to California to discuss filming procedures. Not only is the defendants' argument here untenable, but it leads this Court to wonder how the filmmaker defendants could question the reach of Virginia's long-arm statute over them given that their contracts with Virginia were of a much greater magnitude than Brown's contracts with California.

Accordingly, for the Court to transfer the action to the Central District of California, it would have to order that Brown be severed from the action under Rule 21 of the Federal Rules of Civil Procedure prior to the transfer. Although such a severance is within the power of the Court, the practice is generally disfavored:

In view of the fact that the balance of convenience must be strongly in favor of the defendant to upset plaintiff's choice of venue, and the general preference in the federal courts for unitary adjudication, severance for purposes of transfer under § 1404(a) is rarely appropriate.

3A Moore's Federal Practice Para. 21.05[2] at 46–47 (2nd ed. 1985).

Severance may be proper where the non-transferred party is only secondarily or peripherally involved in the suit, and where the "administration of justice would be materially advanced by severance and transfer." *Wyndham Assoc. v. Bintliff,* 398 F.2d 614, 618–19 (2nd Cir.), *cert. denied,* 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968). Here, however, severance and transfer is a wholly unappealing alternative as defendant Brown is centrally involved in the litigation. Brown is a major figure in the fraud allegedly perpetrated on the plaintiff, and all indications are that the proof against the filmmakers is identical to the proof against defendant Brown in every major respect. Plaintiff's Opposition to Motion to Dismiss at 38–39. His severence from the action would result in "unwarranted duplication and complications in discovery" and throughout the cause of litigation. *See SEC v. National Student*

*Marketing Corp.*, 360 F.Supp. 284, 296 (D.D.C.1973).

Moreover, the Court is not convinced that the Central District of California would be the more convenient forum even if it were appropriate to sever defendant Brown from the action. The burden is on the filmmaker defendants to establish that the "circumstances of the case are strongly in favor of the transfer." *Texas Gulf Sulphur Co. v. Ritter,* 371 F.2d 145, 147 (10th Cir.1967).

The filmmaker defendants have submitted affidavits which allege that their witnesses would be greatly inconvenienced by a trial in Virginia. The plaintiff has filed similar affidavits concerning a California trial location. Plaintiff listed thirteen witnesses it may call, nine of whom live in Virginia, one who lives in New York, one who is stationed in Japan, and two Navy personnel whose last known addresses were in Virginia. The filmmaker defendants have proffered evidence of seven witnesses they intend to call, each of whom lives in California and would thus be inconvenienced by a trial in Virginia. Upon questioning by the Court, however, counsel for these defendants admitted that only two of these witnesses are not either a defendant in this action or employed by one of the corporate defendants. Thus, as far as the convenience of the parties and their witnesses is concerned, transfer of this action is not warranted.

Similarly, the other factors to be considered do not favor transfer. Documentary evidence is located both here and in California, but as the majority of the relevant events underlying the cause of action occurred here, Virginia is the more convenient forum with respect to the gathering of all the evidence. Also, considering the calendars of the respective courts, the parties are likely to receive a swifter resolution of their dispute here.

In short, the filmmaker defendants have not met their burden of proving that the. Central District of California would be a more convenient forum for this action. Especially where, as here, transfer would result in unwarranted duplication of litigation efforts, the interests of judicial efficiency lead the Court to deny the defendants' motion to transfer.

## FILMMAKER DEFENDANTS' MOTION TO DISMISS COUNT II OF THE COMPLAINT

■ The Court now turns to the filmmaker defendants' motion to dismiss Count II of the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Count II alleges that these defendants violated the False Claims Act, which provides a cause of action for damages against any person who "knowingly presents, or causes to be presented, to an officer or employee of the Government or a member of an armed force a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(1), or any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(3).

The issue before the Court is whether the report submitted by defendant Brown that allegedly understated Navy flying time spent on the movie constitutes a "claim for payment or approval" within the meaning of the False Claims Act. Defendants challenge the existence of a claim on two fronts.

First, defendants argue that Brown's report is not a claim because it "merely stated information subsequently used by the Navy in billing the filmmakers" rather than requesting the government to pay Brown or anyone for services provided. Filmmaker Defendants' Reply Memorandum at 34. Defendants' contention is without merit. Viewed in isolation, Brown's report merely provided information. However, as it allegedly was Brown's responsibility to keep track of Navy flight hours on the film so that the Navy could be reimbursed at an agreed upon rate, see paragraphs 12, 14, 16 and 18 of the plaintiff's Complaint, the purpose for filing the report was clearly more than informational. Nor does it matter that the filmmakers did not directly deal with the government as far as

the allegedly false report is concerned. *See, e.g., United States v. Lagerbusch,* 361 F.2d 449 (3d Cir.1966).

 The filmmakers second, and more significant, contention is that the False Claims Act only applies where an individual falsely convinces the government to pay out funds, or to pay out too much in funds, rather than situations where an individual fraudulently pays too little to the government. Although logically the difference between the two types of fraud seems insignificant, the Supreme Court has not directly addressed this question and the lower federal courts that have considered the issue have split on the appropriateness of drawing such a distinction. The Fourth Circuit Court of Appeals has not yet had an opportunity to address this issue.

Perhaps underlying the disagreement among the lower courts is the fact that the two major Supreme Court cases interpreting the "claim for payment or approval" language in the False Claims Act are not in perfect harmony. *Cf. United States v. Neifert-White Co.,* 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968); *United States v. McNinch,* 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958). Despite plaintiff's use of *McNinch* to support the broad proposition that the False Claims Act was designed to prevent all "plundering of the public treasury" whether it results from the government paying too much or receiving too little, Plaintiff's Response Memorandum at 10 (quoting *McNinch,* 356 U.S. at 599, 78 S.Ct. at 952), much of the language in the *McNinch* opinion undercuts plaintiff's position.

The issue before the Supreme Court in *McNinch* was whether an allegedly false application for credit insurance fell within the scope of the False Claims Act. The government argued that such an application was a "claim" in the sense that it allowed an applicant to draw upon the government's credit.

The Court began its analysis by noting that:

> In determining the meaning of the words "claim against the Government" we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions.

*Id.* at 598, 78 S.Ct. at 952.

The Court went on to examine the brief legislative history of the False Claims Act, concluding that the Act was "not designed to reach every kind of fraud practiced on the government." *Id.* at 599, 78 S.Ct. at 953. Rather, the "plundering" of the public treasury that Congress wanted to stop was individuals billing the government for non-existent or worthless goods, or the charging of exorbitant prices for delivered goods. *Id.* In this light, and considering that a "claim against the government normally connotes a demand for money or some transfer of public property," *id.,* the Court held that an application for credit insurance was outside the scope of the Act.

Given the Court's somewhat restrictive interpretation of the False Claims Act in *McNinch,* defendants' contention that the Act was not designed to reach their conduct would have more force if *McNinch* had been the latest Supreme Court case interpreting the relevant portions of the Act. When the Supreme Court decided *Neifert-White* almost ten years later, however, its approach to the False Claims Act was markedly different.

The facts of *Neifert-White* were more in line with traditional definitions of false claims than was the case in *McNinch.* In *Neifert-White,* the defendant grain dealer deliberately overstated the value of storage bins sold to his customers in order to induce a government agency to make loans to these customers in amounts in excess of its regulations. The Court of Appeals for the Ninth Circuit had held that an application for a loan was not a "claim for payment or approval" within the meaning of the Act. The Supreme Court reversed.

The Supreme Court defined the issue before it as follows:

Does the False Claims Act reach "claims" for favorable action by the Government upon applications for loans or is it confined to "claims" for payments due and owing from the Government? It is respondent's position that the term "claims" in the Act must be read in its narrow sense to include only a demand based upon the Government's liability to the claimant. Respondent relies upon *United States v. Cohn*, 270 U.S. 339 [46 S.Ct. 251, 70 L.Ed. 616] (1926), and *United States v. McNinch*, 356 U.S. 595 [78 S.Ct. 950, 2 L.Ed.2d 1001] (1958), to support this narrow reading.

390 U.S. at 230, 88 S.Ct. at 960.

The Court then went on to discuss the intended scope of the Act. Evaluating the legislative history that had previously been discussed in *McNinch* the Court concluded that "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government" and added that "the Court has refused to accept a rigid, restrictive reading [of the statute]." *Id.* at 232, 88 S.Ct. at 962. The Court's broad interpretation was undercut somewhat by its formal holding that "claims" include all fraudulent attempts to cause the Government to pay out money," *id.* at 233, 88 S.Ct. at 962, but the overall tenor of the opinion is that the term should be interpreted so as to reach all types of fraud that result in immediate financial loss to the government.

The Supreme Court's opinions did not directly address the issue before this Court, namely whether the term "claim for payment approval" includes attempts to defraud the government by individuals who fail to reimburse the government for money expended or services rendered by the United States. The lower Court opinions that have addressed this issue must nevertheless be carefully analyzed in light of the *McNinch* and *Neifert-White* decisions.

Typical of the cases that favor defendants' position is *United States v. Howell*, 318 F.2d 162 (9th Cir.1963). In *Howell* a False Claims Act suit was brought against the operators of laundering facilities on armed services bases who had agreed to pay the government a specified percentage of their gross receipts in exchange for the right to operate on a military property. The United States alleged that these operators understated their gross receipts and thereby paid the government less than they should have.

The Ninth Circuit panel rejected the government's contention that fraudulently seeking to reduce the amount owed the government is no different from fraudulently demanding money from the government, explaining that the government's reasoning would only be valid "if we were dealing with a general fraud statute." *Id.* at 166. However, this Court is of the opinion that the *Howell* decision, which was delivered five years before *Neifert-White* was decided, is out of line with the Supreme Court's suggestion in that case that the False Claims Act "was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." 390 U.S. at 232, 88 S.Ct. at 961.

The Court thus adopts the reasoning of *Smith v. United States*, 287 F.2d 299 (5th Cir.1961), where a false statement similar to the one in *Howell* was held to present a cognizable claim under the False Claims Act. In *Smith*, the defendant was the lessee of a government-owned apartment complex. Under the lease arrangement the lessee paid a specific percentage of rent receipts to the government and the government also agreed to advance funds to cover any operating deficits. The United States alleged that the defendant overstated certain expenses, causing it to underpay rent in one period and to receive funds to cover operating deficits in another.

The Court stated that the false reports violated the False Claims Act because "the inclusion of the items [in the reports] had a direct and immediate impact on the Treasury." *Id.* at 300. The Court held that it did not matter whether the false statements caused the government to pay out too much as opposed to receiving less than it deserved, so long as the "expenses were

... ultimately borne by the United States Treasury." *Id.* at 304.

The alleged false claim in the case at hand also was ultimately borne by the Treasury. Taking the facts as alleged to be true, the government not only received less than it was entitled to under the contract, it performed services and expended funds (for flight fuel, etc.) for which it was not reimbursed. As a result, the government suffered "immediate financial detriment." *McNinch,* 356 U.S. at 599, 78 S.Ct. at 952; *Neifert-White,* 390 U.S. at 232, 88 S.Ct. at 961. Under these circumstances, both *McNinch* and *Neifert-White* compel this Court to hold that the False Claims Act encompasses this behavior.

Viewed in another light this result is equally compelling. Even in its narrowest form, a false claim encompasses a fraudulent request for government funds or property. *United States v. Cohn,* 270 U.S. 339, 345, 46 S.Ct. 251, 252, 70 L.Ed. 616 (1926). Since Courts have generally held that government property includes government services, *e.g., United States v. Alperstein,* 183 F.Supp. 548 (S.D.Fla.1960), *aff'd,* 291 F.2d 455 (5th Cir.1961), a fraudulent request for government services falls within the scope of the Act as well. The fraudulent transaction allegedly involved here is nothing more than a fraudulent request for government services that took the form of Navy flight time. It cannot make a difference whether the document that represents the alleged false request was received before or shortly after the services were performed. The impact on the government is the same.

The filmmaker defendants' Motion to Dismiss Count II for failure to state a claim is therefore DENIED.

IT IS SO ORDERED.