**John DOE, et al., Plaintiffs,**

v.

**Joseph P. CONNORS, et al., Defendants.**

**Civ. A. No. 92–0022–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

March 17, 1992.

James E. Elliott, Mark M. Lawson, Steven R. Minor, Bristol, Va., Robert H. Stropp, Jr., Earl V. Brown, John R. Mooney, Paul A. Green, Washington, D.C., Scott W. Mullins, Coeburn, Va., for plaintiffs.

William B. Poff, Roanoke, Va., BCOA, Peter Buscemi, Robert A. Dufek, Washington, D.C., BCOA, John E. Kieffer, Bristol, Va., Trustees, David W. Allen, Margaret M. Topps, Angela T. Kennedy, Office of Gen. Counsel, UMWA Health & Retirement Funds, Washington, D.C., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

John Doe Plaintiffs institute this class action individually and on behalf of the beneficiaries of the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Trust") and 1974 Benefit Plan and Trust ("1974 Trust") (collectively, "the Trusts"). Plaintiff–United Mine Workers of America ("UMW") is an unincorporated association and labor organization within

the meaning of section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5) and represents active and retired employees in the coal industry throughout the United States and Canada. This case is before the court on John Doe Plaintiffs' motion for a preliminary injunction.

Plaintiffs bring this action against Joseph P. Connors, Donald E. Pierce, William Miller, Thomas H. Saggau, and Paul R. Dean, trustees of the Trusts ("Trustees"). The Bituminous Coal Operators' Association, Inc. ("BCOA"), a multiemployer bargaining group formed for the purpose of bargaining with the UMW on behalf of certain coal industry employers, is also named as a party defendant.

Plaintiffs assert jurisdiction pursuant to §§ 502(a)(1)(B) and (a)(3), (e)(1) and (f) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), (e)(1) and (f), and § 301 of the Labor Management Relations Act, as amended ("LMRA"), 29 U.S.C. § 185(a). Plaintiffs assert venue pursuant to § 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), and § 301(a) of the LMRA, 29 U.S.C. § 185(a).

## THE 1950 AND 1974 BENEFIT TRUSTS

The UMW and the BCOA have negotiated successive National Bituminous Coal Wage Agreements ("NBCWA" or "Agreement") since 1950. The Trusts were established as part of the NBCWAs to provide health care benefits to retired miners and their eligible dependents.[1] Prior to February 1, 1988, the effective date of the most recent NBCWA, the Trusts were funded primarily by each ton of coal produced by the signatory employers.[2] Since February 1, 1988, the Trusts are funded primarily by contributions based on each hour of classified work performed under the NBCWA

for each signatory employer ("contribution units"). The amount to be contributed to the Trusts is determined in collective bargaining between the UMW and the BCOA.

The contributions into the Trusts are dependent on the contribution units. Thus, during the term of the 1974 NBCWA (December 6, 1974 through December 6, 1977) numerous wildcat strikes caused a particular strain on the Trusts. The BCOA has alleged that the wildcat strikes of that period cost an aggregate loss of $22 million. *Bituminous Coal Operators' Association v. International Union, UMW*, 585 F.2d 586, 590 (3d Cir.1978). As a result of the severe strain on the Trusts, the Trustees were forced to curtail the benefits during the term of the 1974 NBCWA pursuant to a Suspension Clause which stated:

> In the event the assets of [the Trusts] become insufficient to pay the benefits provided under the Plan, the benefits may be suspended or reduced to amounts which, in the judgment of the Trustees, can be paid from the assets of [the Trusts].

United Mine Workers of America, 1950 Benefit Plan and Trust, Art. III(B) at 16 (1974); *see also* United Mine Workers of America, 1974 Benefit Plan and Trust, Art. III(C) at 18 (1974) (virtually identical language).

As a result of the suffering and hardship cause by the curtailment of health care benefits under the 1974 NBCWA, subsequent agreements included a Guarantee Clause which provides in pertinent part:

> Notwithstanding any other provision in this Agreement, the Employers hereby agree to fully guarantee the ... health benefits provided by the ... 1950 Benefit Fund ... [and] the 1974 Benefit Fund ... during the term of this Agreement. In order to fully fund these guaranteed benefits, the BCOA may increase, not

---

**1.** The court notes that the NBCWA also created the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust which provides pensions for retired miners. No issue related to these pension funds is involved in the present case.

**2.** The NBCWA is binding on three separate groups of employers. First, the NBCWA binds the BCOA and its members. The Agreement,

however, is also binding on non-BCOA companies who agree to be bound by signing "me-too" contracts with the UMW. Finally, companies who signed the 1978, 1981, or 1984 NBCWA agreed, in a provision known as the evergreen clause, to continue making contributions to the Trusts as long as successor collective bargaining agreements required such contributions.

decrease, the rate of contributions to be made to the ... 1950 Benefit Fund ... [and] the 1974 Benefit Fund ... during the term of this Agreement. These contributions, which may be adjusted from time to time, shall be made by all employers signatory hereto during the term of this Agreement.

National Bituminous Coal Wage Agreement of 1988, Art. XX § (h) at 141–42.

Furthermore, the Suspension Clause has been modified in subsequent agreements to specifically prohibit suspending the Trusts during the term of the agreement. Hence, the Suspension Clause of the current 1988 agreement provides that:

In the event the assets of [the Trusts] become insufficient to pay the benefits provided under the Plan on or after February 2, 1993, the benefits may be suspended or reduced to amounts which, in the judgment of the Trustees, can be paid from the net assets of [the Trusts].

United Mine Workers of America, 1950 Benefit Plan and Trust, Art. III at 6 (1988); United Mine Workers of America, 1974 Benefit Plan and Trust, Art. III at 8 (1988).

### FACTS

As the court understands it, as of January 31, 1992, the Trust deficit for the 1950 Trust was $108,888,000 (Exhibit 11) and the deficit for the 1974 Trust was $17,234,000. (Exhibit 10). The testimony is undisputed that the projected deficit for the combined Trusts is estimated to reach $140,000,000. Plaintiffs contend that the BCOA set the contribution rate at an insufficient rate as part of a conscious and concerted scheme to further their own legislative agenda. Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Plaintiffs' Memorandum") at 11.

As a result of the deficit in the Trusts, on June 20, 1989, the Trustees filed a suit in the United States District Court for the District of Columbia ("D.C. District Court") against the BCOA, *United Mine Workers of American 1950 Benefit Plan and Trust et al. v. Bituminous Coal Operators' Association*, Civil Action No. 89–1744

(D.D.C.) (the "1950 Trust Guarantee Clause Litigation"), seeking an injunction to require compliance with the Guarantee Clause and requiring an increase in the contribution rate to the 1950 Trust. On March 23, 1990, the Trustees filed a similar action in the same court on behalf of the 1974 Trust, *United Mine Workers of America 1974 Benefit Plan and Trust et al. v. Bituminous Coal Operators' Association*, Civil Action No. 90–0674 (D.D.C.) (the "1974 Trust Guarantee Clause Litigation"), seeking an injunction against the BCOA with regard to the Guarantee Clause.[3]

The district court denied the Trustees' preliminary injunction request in the 1950 Trust Guarantee Clause Litigation citing a failure to demonstrate a likelihood of success on the merits. The United States Court of Appeals for the District of Columbia Circuit reversed, however, and found that the Trustees were likely to succeed on the merits of their claim. The district court subsequently granted the preliminary injunction. By separate order, the district court also granted an injunction in the 1974 Trust Guarantee Clause Litigation. The injunctions were limited, however, to a four-month period. The Trustees and the BCOA eventually entered into an agreement for the increased contribution rate. The agreement expired April 30, 1991. At that time, the BCOA continued the contribution rate for the 1974 Trust but reduced the 1950 Trust to the pre-injunction rate.

The situation remained unchanged until January 6, 1992, when the Trustees disclosed their decision to notify John Doe Plaintiffs on March 1, 1992 that the payments of health benefits under the Trusts would be suspended in mid-April, 1992. *See* Plaintiffs' Attachment 18; *see also* Plaintiffs' Attachment 17, at 8 (Memorandum of Points and Authorities In Support of Plaintiffs' [Trustees'] Motion For A Preliminary Injunction, *UMW 1950 Benefit Plan and Trust v. BCOA*, Civil Action No. 89–1744 (D.D.C. Jan. 15, 1992)). On January 15, 1992, the Trustees requested that

---

**3.** The cases were subsequently consolidated.

the D.C. District Court issue a new injunction increasing the contribution rate. On February 13, 1992, the district court orally denied the Trustees' request for a preliminary injunction but set a June 15, 1992 trial date on the merits of the Trustees' claims. The Trustees appealed the district court's decision, but as of this date, no injunction has been issued.

On February 26, 1992, John Doe Plaintiffs brought suit in this court asserting that the Trustees breached their fiduciary duty to Plaintiffs by an arbitrary and capricious decision to suspend health care benefits to the Trusts beneficiaries. Plaintiffs sought to enjoin the Trustees from suspending the payment of health benefits prior to the conclusion of the June 15, 1992 trial between the Trustees and the BCOA before the D.C. District Court (Civil Action No. 1744), and also sought to enjoin the Trustees from notifying or taking any other action stating or suggesting that payment of health care benefits under the Trusts would be suspended.

Plaintiffs concurrently filed a motion for a temporary restraining order ("TRO") seeking to enjoin Defendants "from ceasing, or threatening to cease, the payment of health care benefits" under the Trusts. On February 26, 1992, the court granted Plaintiffs' TRO thereby preventing Defendants from suspending the payment of health benefits to John Doe Plaintiffs and from taking any action stating or suggesting that the payment of health care benefits under the Trusts would be suspended.

On March 4, 1992, a hearing was held and the court heard the motion of John Doe Plaintiffs to add the BCOA as a party-defendant and a motion for leave to file an amended complaint. Both motions were granted. The court also (1) extended the TRO until March 16, 1992 when the court would continue to hear argument on the motion for preliminary injunction, (2) enjoined the Trustees from mailing any notices to the beneficiaries of the Trust regarding suspension of payments until after the hearing, and (3) directed the Trustees to refrain from suspending payments to either the beneficiaries or any health care

providers of the same until the March 16th hearing.

John Doe Plaintiffs subsequently amended their complaint. In addition to the breach of fiduciary duty claim against the Trustees, Plaintiffs asserted two additional claims against the BCOA: (1) the BCOA breached its contract with the UMW by refusing to increase the employer contribution rate to a level sufficient to fund the Trusts (John Doe Plaintiffs assert they are third-party beneficiaries of that contract); and, (2) the BCOA breached its fiduciary duty under its discretionary authority to fund the Trusts by failing to increase employer contributions to fully fund the Trusts. Plaintiffs now seek (1) to enjoin the Trustees from suspending the payment of health care benefits under the Trusts, (2) to enjoin the Trustees from notifying or taking any other action stating or suggesting that payment of health care benefits under the Trusts will be suspended, (3) a declaratory judgment that the BCOA is obligated to increase the employer contribution rate to the Trusts in an amount sufficient to fully fund the payment of health benefits under the Trusts, and (4) to enjoin the BCOA to increase the employer contribution rate.

On March 16, 1992, the court heard oral argument on John Doe Plaintiffs' motion for a preliminary injunction against the Trustees and the BCOA.

## DISCUSSION

### Service of Process

In argument, counsel for BCOA asserted that Plaintiffs had not provided adequate service of process. Despite counsel's argument, the court has absolutely no evidence before it to support these allegations. The court file contains an affidavit stating that the process server served BCOA personally in the District of Columbia. ERISA specifically provides for nationwide service of process. 29 U.S.C. § 1132(e)(2). Therefore, service was proper under ERISA.

BCOA also alleged that a faxed complaint to its Washington, D.C. offices was insufficient service of process. Even if the

evidence supported this allegation, Fed. R.Civ.P. 4(e) permits the use of state law to serve process in federal court actions. *Pennington v. McDonnell Douglas Corp.,* 576 F.Supp. 868, 870 (E.D.Va.1983). Under Virginia law, "[e]xcept for process commencing actions for divorce or annulment of marriage or other actions wherein service of process is specifically prescribed by statute, process which has reached the person to whom it is directed within the time prescribed by law, if any, shall be sufficient although not served or accepted as provided in this chapter." Va.Code Ann. § 8.01–288 (Cum.Supp.1991). "Provided the defendant has received the process and the action is not one for divorce or annulment, how the process comes to the defendant's attention is no longer of any consequence in Virginia." *Pennington,* 576 F.Supp. at 872; *see also Karara v. County of Tazewell, Virginia,* 450 F.Supp. 169, 170 n. 1 (W.D.Va.1978), *aff'd,* 601 F.2d 159 (4th Cir.1979). Therefore, even if the allegations were supported by the evidence, the service would be sufficient.

## *Personal Jurisdiction*

■ The BCOA moves the court to dismiss the claim against it for lack of personal jurisdiction. Once a defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of evidence, facts sufficient to establish personal jurisdiction. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). In considering the challenge, the court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* at 676. In *Industrial Carbon Corp. v. Equity Auto Equipment Leasing Corp.,* 737 F.Supp. 925, 926 (W.D.Va.1990), this court recognized the standard for determining whether to grant a motion to dismiss based on personal jurisdiction. The court noted that if the defendant introduced evidence denying an element essential for jurisdiction, the plaintiff must present sufficient evidence to create a factual dispute. If the defendant produced no such evidence, and the court was left to determine jurisdiction solely on the basis of the affidavits, the plaintiff was required only to present a prima facie case for personal jurisdiction. *Id.* at 926.

■ The Fourth Circuit has determined a two-step analysis to determine whether personal jurisdiction can be had. First, the court determines whether the non-resident's activities fall within the state's long arm statute, and second, the court's exercise of jurisdiction must comport with due process. *Peanut Corp. of America v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982).

■ The Virginia long arm statute provides that a court may exercise personal jurisdiction over any person who "transacts business" in Virginia. Va.Code Ann. § 8.01–328.1 (Cum.Supp.1991). The statute has been construed to reach to the full extent of due process protection. *Bassett Furniture Industries, Inc. v. Sexton,* 596 F.Supp. 454, 456 (W.D.Va.1984) (citations omitted).

Due process requires that the non-resident defendant have "purposely established" certain "minimum contacts" with the state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The Court has also held that "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

The leading case on this issue is *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). There the Court concluded that lack of actual physical presence in the forum state does not necessarily destroy personal jurisdiction. The Court stressed:

[a]lthough territorial presence frequently will enhance a potential defendant's affil-

iation with a state and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communication across state lines, thus obviating the need for physical presence within a state in which business is conducted. So long as a commercial actor's efforts are purposefully directed toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* at 476, 105 S.Ct. at 2184. The Court went on to declare, "with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities. *Id.* at 473, 105 S.Ct. at 2182–83. The court is persuaded that this is precisely the circumstances in the present case.

Numerous Virginia coal mines are signatory of the NBCWA with active operations in Virginia. That the BCOA acts as a representative of at least two Virginia coal companies is unquestioned. The evidence is strong that BCOA has entered into negotiations on behalf of these companies for the benefit of the Virginia companies. Therefore, in the words of *Burger King,* the BCOA has "reach[ed] out beyond one state" to create "continuing [contractual] relationships and obligations" with citizens of the Commonwealth of Virginia and thus subjects itself to personal jurisdiction in Virginia. Moreover, the relationship between the BCOA and Virginia companies is well established. The relationship is not random, inadvertent, or isolated but rather ongoing and purposeful.

Moreover, the court has heard evidence that the BCOA has established arbitration panels who arbitrate labor disputes that arise throughout the coal fields, presumably including Virginia; the BCOA seeks out and received information and recommendations from BCOA members which operate in Virginia; and the BCOA Benefits Committee currently has as a member a representative from a Virginia coal company. The BCOA cautions that the BCOA does not receive membership dues from any coal company operating in Virginia. While this may be true, the court is persuaded that the amount the headquarters may pay is a function of the local company's production level, as is its voting power within the BCOA.

Not only has the BCOA entered into a contractual relationship with Virginia companies, the evidence is equally unquestioned that well over 8,000 Virginians are affected by the NBCWA. (Exhibit 3). The BCOA controls these beneficiaries' benefits by virtue of the BCOA's authority to set contribution rates to the Trusts. Approximately 147 Virginia employers are signatory employers to the 1988 NBCWA and are therefore affected by the contribution rate established by the BCOA. Approximately 35 of those employers continue to operate in Virginia.

The court is also persuaded by the recent holding in *Skelton v. Lowen,* 665 F.Supp. 469 (E.D.Va.1987). In *Skelton,* the widow of a union member brought suit against the trustees of a health and benefit plan. The plan provided medical and disability benefits to members of the International Organization of Masters, Mates and Pilots, AFL/CIO. Under the plan, the union member was entitled to disability benefits and, according to the plaintiff, the defendant refused to pay medical expenses and disability benefits. The defendant moved to dismiss for lack of jurisdiction citing many of the same arguments advanced by the BCOA.[4] Despite the defendant's conten-

---

4. Specifically, the defendant in *Skelton* maintained that "no contributing employer under the Plan is located in Virginia, and the Plan is not licensed to do business in the Commonwealth. Neither the Plan's trustees nor its employees have ever made decisions regarding any Plan business in Virginia, including the decision regarding the decedent's claim for benefit. The Plan has no office, records, employees, bank accounts, property, or telephone listing in Virginia. The Board of Trustees of the Plan has never met in Virginia, and defendant's only con-

tion that the court lacked jurisdiction because the Plan was not "present" in Virginia, the court pronounced that Virginia courts had jurisdiction because "[f]rom its inception, the Plan has 'reached out' beyond the state where its office is located and created 'continuing obligations' with residents of other states." *Id.* at 472. The reasoning in *Skelton* is applicable here. The BCOA's argument that the agreement was entered into in the District of Columbia and that the main offices are in the District of Columbia is not dispositive on the issue that the BCOA can only be sued in District of Columbia courts. In light of strong evidence of sufficient contacts in Virginia, lack of physical presence in Virginia is not problematic. *See Bassett Furniture,* 596 F.Supp. at 457. Therefore, the court finds that there are sufficient minimum contacts with the forum state so as to sustain the assertion of personal jurisdiction without offending the traditional notions of fair play and justice.[5]

### Venue

■ The BCOA asserts that this case is properly transferred to the D.C. District Court. The court recognizes the test set out in *Board of Trustees, Sheet Metal Workers National Fund v. Baylor Heating & Air Conditioning, Inc.,* 702 F.Supp. 1253 (E.D.Va.1988) outlining the factors to consider in deciding whether to transfer a case pursuant to 28 U.S.C. § 1404(a).[6] These factors are (1) the plaintiff's choice of venue, (2) the convenience of the parties and witnesses, and (3) the interest of justice. *Id.* at 1255–56. Defendants have the burden to show that "the balance of equities is in their favor [and] that judicial economy and convenience to all parties favor suit in another forum." *Eldridge v. Bouchard,* 620 F.Supp. 678, 684 (W.D.Va. 1985).

In considering Plaintiff's choice of venue, the court must (1) determine whether the court is the proper venue, and (2) consider the weight of the plaintiff's choice of forum.

■ The court agrees that a substantial contacts test is proper to determine venue. *United States v. Douglas,* 626 F.Supp. 621, 624 (E.D.Va.1985). In *Douglas,* the court maintained that:

[u]nder this test, the plaintiff must show that a substantial part of the events giving rise to the claim occurred in the district. Thus, neither the place of performance nor the place of contracting are dispositive as to the propriety of venue.

*Douglas,* 626 F.Supp. at 624. As discussed *supra,* the court finds that the BCOA established sufficient contacts with the Commonwealth of Virginia to give rise to a valid claim against it in this forum.

Courts recognize that the plaintiff's choice of venue should be accorded substantial weight. In *Eldridge,* this court maintained that the "plaintiff's choice of forum should rarely be disturbed unless the balance is strongly in favor of defendant." *Eldridge,* 620 F.Supp. at 684. Moreover, this court declared that "the plaintiff has [the] primary right to choose his forum and that selection is not to be easily overthrown." *Id.* The court finds BCOA's argument that no "substantial nexus" between this forum and the beneficiaries without merit. Indeed, nearly 9,000 of the beneficiaries live in Virginia, not to mention the many thousands who live in nearby West Virginia, Kentucky, and Ten-

---

tact with the Commonwealth was the mailing of notice of a denial of benefits and related eligibility materials to decedent's home address." *Skelton,* 665 F.Supp. at 470–71.

**5.** The court also notes that the BCOA has itself sued in this forum and in other forums outside the District of Columbia. *See BCOA v. Hathaway,* 406 F.Supp. 371 (W.D.Va.1975), *aff'd,* 547 F.2d 240 (4th Cir.1977); *see also BCOA v. UMW,* 431 F.Supp. 774 (W.D.Pa.1977), *aff'd in part reversed in part,* 585 F.2d 586 (3d Cir.1978). Although the court agrees that choosing a forum

as a party plaintiff does not bind a party to the scope of personal jurisdiction for all time, the court does deem that a party cannot seek court protection on one hand and denounce jurisdiction with the other.

**6.** Section 1404(a) provides that: For the convenience of the parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

nessee. The plaintiffs have chosen to sue to BCOA and the Trustees in the Western District of Virginia and the court finds no reason to grant that decision anything but the strongest weight.

Moreover, the court finds that the convenience of the parties is better suited to this forum. The beneficiaries primarily live in the coal field areas. The evidence shows that of 118,000 beneficiaries, 51 reside in the District of Columbia. (Exhibit 2). The BCOA maintains that the UMW, the BCOA, and the Trustees are situated in the District of Columbia and that forum would be more convenient to the parties. The BCOA's assertion that choice of forum for Plaintiffs is "no more than a neutral factor in this case" clearly fails to acknowledge who these plaintiffs are: the elderly and sick. Travel to the District of Columbia would be no easy task.

Moreover, the court notes that all the parties are represented by local counsel. The BCOA itself is represented by counsel situated within the district. Plaintiffs' counsel is within the district and the Trustees and the UMW all have well established relationships with local counsel. The very attorneys who argued the present case are local counsel.

Finally, the court considers the interest of justice. This case has been delayed in the D.C. District Court until the situation has reached a crisis point. Although the BCOA asserts that it is ready to try the case as scheduled in June, 1992, the evidence indicates otherwise. Plaintiffs are hurting now. This court is prepared to try the case now. The interest of justice weighs in favor of trying the case in the present forum.

### Collateral Estoppel

The BCOA contends that the court is estopped from relitigating the D.C. District Court's preliminary injunction ruling. In determining the application of collateral estoppel, the court must weigh the following five factors: (1) the party against whom the estoppel is asserted must have been a party or in privity with the party in the prior action; (2) there must have been a final determination of the merits of the issues to be collaterally estopped; (3) the issues decided in the prior action must have been necessary, material, and essential to the prior case; (4) the party against whom the estoppel is to be applied must have had a full and fair opportunity to litigate the issues; and, (5) the issues in the prior litigation must be identical to the issues sought to be estopped. *Polk v. Montgomery County, Maryland*, 782 F.2d 1196, 1201 (4th Cir.1986).

Clearly, Plaintiffs are not a named party in the D.C. District Court case. The BCOA, however, cites *Spiker v. Capitol Milk Producers Cooperative, Inc.*, 577 F.Supp. 416, 418 (W.D.Va.1983) for the proposition that the doctrine of collateral estoppel applies to parties who are in privity with the party who litigated the issue at the previous hearing. However, as the court in *Spiker* noted "[s]uch a relationship may extend to those person who were not formal parties to the first litigation but who actively participated in it." *Id.* at 418.

The court has no evidence before it to suggest that the beneficiaries are participating or have participated in any of the proceedings before the D.C. District Court. The UMW attorney indicated that, although the UMW is not a party and, in fact, has had a motion to intervene pending since September 26, 1991, it has been represented at hearings and has appeared in affidavits and depositions. The docket sheets for the D.C. District Court cases reveal that no such motion to intervene has been entered on behalf of the beneficiaries and the John Doe Plaintiffs (the beneficiaries) aver that they have made no appearances before the D.C. District Court.

Collateral estoppel may also be applied to non-parties where the litigating party acted in a fiduciary capacity in protecting the non-parties' interest. The BCOA seems to suggest that the fiduciary relationship between the Trustees and the beneficiaries automatically place the parties in privity for purposes of the D.C. District Court cases. The fiduciary relationship between the Trustees and the beneficiaries alone, however, does not give rise

to privity for purposes of collateral estoppel. While the Trustees may have a fiduciary duty to the beneficiaries, that duty extends only to the extent that the Trustees must manage the Trusts in a proper way. The record reveals that in the proceedings before the D.C. District Court, the Trustees duty has been to the Trusts and not directly to the beneficiaries.

Although the court finds that Plaintiffs were not in privity with the Trustees in the D.C. District Court case and that collateral estoppel, therefore, does not apply here, the court is persuaded that collateral estoppel also requires that the party against whom collateral estoppel will lie must have a full and fair opportunity to be heard. Clearly, Plaintiffs here have had no such opportunity. As a class, Plaintiffs have not been represented at any hearing in the D.C. District Court cases, nor have they had an opportunity to brief the issues or appear before Judge Jackson. No where in the pleadings or in any evidence before this court do the Trustees assert that they represent the interest of the beneficiaries. Moreover, the group most likely to adequately represent the interest of the beneficiaries, the UMW, is not even named as a party in the D.C. District Court cases.

Furthermore, collateral estoppel cannot apply until a final order on the merits has been granted. The D.C. District Court dismissed without prejudice the petition for injunctive relief. Thus, a non-ruling by a court is not a denial of relief nor a grant of relief. It is a non-dispositive order which takes that portion of the suit out of the case, subject to be reinstated in that court or refiled in another court. The issue has not been decided and, therefore, collateral estoppel cannot apply.

Denying the beneficiaries the right to be heard is fundamentally unfair. As the party with the most to lose, the least the court can offer them is a right to be heard and a full and fair hearing. Therefore, the court holds that BCOA's motion to dismiss for reasons of collateral estoppel is denied.

### Comity

The BCOA asks this court to supplant jurisdiction of this case to the D.C. District Court because that court denied the Trustees a preliminary injunction against the BCOA. The issue of comity has caused this court great anguish. Counsel for BCOA, in an emotional argument to this court, alleges that this court has taken over a pending case involving the same issues now being pursued in the D.C. District Court. Oddly enough, BCOA's brief filed with this court donates two pages out of thirty-four to the issue of comity, citing a total of four cases in support thereof. The other parties to this suit do not mention the doctrine of comity in their briefs filed before this court.

■ In support of its motion to dismiss, BCOA's counsel argued approximately three-quarters of a one hour on the issue of comity, brushing over its other arguments. This court is well aware that when two cases between the same parties are commenced in two different federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first. *Ulmet v. United States,* 888 F.2d 1028, 1031 (4th Cir.1989); *Washington Area Transit Authority v. Ragonese,* 617 F.2d 828, 830 (D.C.Cir.1980). The court notes that in each of the foregoing cases, the plaintiff was the same, the defendant was the same, and the issues were the same.

The BCOA cites four cases in its brief, each of which involved the same plaintiff, the same defendant, and the same issues. Indeed, this court has found no case in which a court dismissed on comity grounds when the parties were different, even though some issues were the same. In summary, the BCOA has failed to present any authority to the court, and the court has made an independent search for authority and finds none where a court with different parties before it has applied the doctrine of comity to dismiss a case.

Moreover, in the D.C. District Court cases, neither the John Doe Plaintiffs nor the UMW are parties. On September 6, 1991, the UMW has sought to become a party. On October 15, 1991, the BCOA filed an objection to the UMW's motion. The court has yet to rule. Therefore, in

the present case, this court has before it two plaintiffs, neither of whose interest are being heard directly by the D.C. District Court. The plaintiff in the D.C. District Court case is a defendant before this court. Thus, two new parties are seeking relief before this court.

The BCOA also contends that the doctrine of comity should apply because the issues are the same in this court as in the D.C. District Court case. The court finds, however, that the issues are not the same, at least in the perception of Judge Jackson. Judge Jackson has never considered that the rights of the beneficiaries of the Trusts are involved before him. At the status conference hearing, counsel for the Trusts attempted to obtain a preliminary injunction. A transcript of the hearing held February 13, 1992 reveals the following colloquy:

> "Mr. Weinberg: The problem ... is that we have a very simple problem. We have health benefits to provide, and we need money to provide them. If we don't have the money, we can't provide the benefits.
>
> The Court: I understand what you think the problem is, but they say you don't have it and, if you have it, you have it of your own making and you are going to have to live with the consequences of the bad decisions you have made. And that is the issue that is going to have to be tried."

BCOA Attachment 15 at 5 (Transcript of Proceeding before The Honorable Thomas P. Jackson, Feb. 13, 1992).

In this same proceeding, the D.C. District Court dismissed the Trustees' motion for a preliminary injunction without prejudice. Thus, at this moment, the issue regarding a preliminary injunction is not before the D.C. District Court; the issue has not been litigated; and the interest of Plaintiffs in this suit have never been presented or heard and are not pending before the D.C. District Court.

The court has examined every document filed in this court relating to the D.C. District Court case and has found no indication that the D.C. District Court considers Plaintiffs in this case as being involved in any way in the litigation in that court. Judge Jackson's view of the case is that if the Trusts run out of money, it simply lives with the consequences.

BCOA argued to this court that if it enters injunctive relief, dire consequences will flow—the Rockefeller Bill will be defeated, and the BCOA, because of its small number, will be eliminated. In regard to these non-legal arguments, the court notes that it is simply ruling on jurisdiction at this time, not on relief. Therefore, to cry wolf at this juncture is premature.

If Congress is so wimpish and weak that it is swayed by a lowly district court's judgment which may give temporary relief to a few elderly and widows, and fails to act on a long term solution to the problem then, in the court's view, Congress never intended to act in the first place. The court would encourage Congress to continue its search for a solution. If the government can bail out New York City, the savings and loan industry, and Chrysler Corporation, whose losses were due to their own neglect, surely it can find a solution to the ills of a few health care beneficiaries in the hills of Virginia, whose plight is *not* of their own making.

If the BCOA is so weak it cannot withstand possible funding from now until June, when it vows it will be prepared to try the case before the D.C. District Court, then it is too weak to continue anyway. After all, it entered into the contract agreeing to fund the Trusts fully of its own accord. It consistently seeks to have this contract enforced before this very court. Why then cry foul when an attempt is made to enforce it against them.

## CONCLUSION

Finally, justice delayed is often justice denied. The court has seldom seen a case that this axiom fits better as the one now before it. For the foregoing reasons, the BCOA's motion to dismiss is hereby denied.