**Wiley Vick FISHER, Jr., et al., for themselves and on behalf of all others similarly situated, Plaintiffs,**

v.

**VIRGINIA ELECTRIC AND POWER COMPANY and Dominion Telecom, Inc., Defendants.**

No. CIV.A. 3:02CV431.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 13, 2003.

Stephen E. Baril, A. Peter Brodell, Samuel W. Hixon, III, Williams Mullen P.C., Richmond, VA, Nels Ackerson, Elaine A. Panagakos, Kathleen C. Kaufman, The Ackerson Group Chartered, Washington, D.C., Randall B. Pridgen, Battle, Winslow, Scott & Riley, P.A., Rocky Mount, NC, for Plaintiffs.

Stephen A. Northup, Matthew B. Kirsner, Troutman Sanders LLP, Richmond, VA, Charles A. Zdebeski, Troutman Sanders LLP, Washington, D.C., Thomas E. Spahn, Robert L. Hodges, McGuireWoods, LLP, George W. Marget, III, John D. Sharer, Dominion Resources Services, Inc., Richmond, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

The Plaintiffs, Wiley Vick Fisher, Jr., John Fisher, Harmon Tomlinson, and Linda Tomlinson (the "Named Plaintiffs" or "class representatives"), filed this action against the Defendants, Virginia Electric and Power Company ("VEPCO") and its affiliated company, Dominion Telecom, Inc. ("DTel") (collectively, the "Defendants") alleging that the Defendants are unlawfully operating a commercial fiber optic network on land that belongs to the Plaintiffs, and others similarly situated, but as to which the Defendants own certain easements. The Plaintiffs now seek class certification in accordance with Fed. R.Civ.P. 23 ("Rule 23"). For the reasons set forth below, the motion is granted.

## BACKGROUND

To fully assess the implications of class certification, and to properly apply Rule 23, it is first necessary to explore the facts that give rise to this action and the legal determinations necessary for its resolution. First, it is necessary to understand the Defendants' fiber optic network and how it led to the claims in the Amended Complaint. Second, it is necessary to examine the source and nature of VEPCO's property interests in the class land underlying its fiber optic network. Finally, it is necessary to determine how the class land is situated within the fiber optic network, both in terms of where the land is located relative to VEPCO's rights-of-way and utility lines and how one makes that determination.

### 1. The Fiber Optic Network and the Plaintiffs' Claims

Briefing on the motion for class certification and the pending cross motions for summary judgment has revealed that the following facts respecting VEPCO's fiber optic network are undisputed. VEPCO is an electric utility company that provides power to over two million homes and businesses in Virginia and North Carolina. Beginning in the 1920s, VEPCO constructed its electricity transmission network by erecting towers or poles that support high voltage transmission wires. The network is located on numerous rights-of-way that VEPCO acquired, by agreement or condemnation, from a variety of landowners. The documents that evidence the numerous property acquisitions employ language that varies depending upon, among other things, when and where VEPCO obtained the rights-of-way.

VEPCO's electricity transmission network includes internal communications facilities for transmitting data and information essential to its electricity business. In the 1980's, VEPCO began plans to replace its existing communications facilities with fiber optic cable, which offers markedly improved capacity and reliability. VEPCO installed the fiber optic network primarily by replacing the preexisting static wire, which protects the facilities from lighting, with Optical Ground Wire ("OPGW"). Essentially, OPGW is an alternate form of static wire that also encapsulates multiple fiber optic cable strands that one may use for communication purposes.

VEPCO's fiber optic network installation has proceeded in two phases. Phase I occurred between approximately 1986 and 1991 and VEPCO did not install any additional

OPGW between 1991 and 1997. Phase II began in 1997 when VEPCO formed a new fiber optic study team to consider leasing excess fiber capacity to third parties. VEPCO has also, in limited circumstances, allowed other telecommunications companies to install additional fiber optic cable on the same property where VEPCO installed OPGW.

In 1997, DTel was incorporated in Virginia as VPS Communications, Inc. ("VPSC"), VEPCO's telecommunications subsidiary. In 2000, VPSC changed its name to Dominion Telecom, Inc. and became a direct subsidiary of Dominion Resources, Inc. DTel is now a telecommunications carrier that leases a portion of VEPCO's excess fiber optic network capacity and, in turn, provides wholesale, commercial telecommunications services throughout the eastern United States. Insofar as is relevant to this action, DTel leases capacity on approximately 695 linear miles of the OPGW that VEPCO installed on its rights-of-way in North Carolina and Virginia.

The Plaintiffs purport to represent a class consisting of "all owners of land in North Carolina and Virginia, other than public streets or highways, that underlies VEPCO's electric transmission lines and on or in which fiber optic cable has been installed." (Amended Compl. ¶ 10). Excluded from the class definition are the Defendants, all state and federal governments and their agencies, any Indian tribe, and the trial judge (who owns no qualifying land). According to the Plaintiffs, the easements that burden their lands are all expressly limited in scope to certain explicit and exclusive purposes related to transmitting electric power, and therefore VEPCO cannot lease, license, convey, or otherwise transfer or create any rights in the underlying land for any other purposes.

There is no dispute that the Defendants have installed OPGW over the land of the potential class members or that the Defendants are using that fiber optic cable for a commercial purpose unrelated to the transmission of electricity. It is also undisputed that, in deciding to install the OPGW, VEPCO and DTel acted, or refused to act, on grounds generally applicable to the putative class.

According to the Plaintiffs, this use of the easements for a commercial purpose unrelated to the transmission of electricity exceeds the scope of VEPCO's property rights in the class land and, therefore, constitutes a continuing trespass. The Plaintiffs also contend that the Defendants have been and will be unjustly enriched by profits resulting from the installation and operation of the fiber optic network. As remedy, the Plaintiffs seek declaratory and injunctive relief; an accounting for, and disgorgement of, all sums the Defendants received as a result of the alleged trespass (or, alternatively, the reasonable value of the improper land use); and, punitive damages.

## 2. The Easements

Over a 75 year span, from 1926 to 2001, VEPCO obtained thousands of easements that burden the class land, some portion of which now underlie VEPCO's fiber optic network. There is no question that class certification would be inappropriate if it were necessary to review each of the thousands of relevant easements grants individually to resolve the primary question in this action—whether a commercial fiber optic telecommunications network exceeds the scope of the easements. To obviate the need for any such individual review, the Plaintiffs have submitted two appendices that each separate the easement grants into nine categories based on the so-called "purpose clause" in each of 20 ostensibly representative easement forms. (Pl.'s Br. In Supp. Mot. Class Cert. Att. 2 ("Class Certification Appendix"); Pl.'s Br. In Supp. Mot. SJ Appx. A ("Summary Judgment Appendix")). The purpose clause is the language in each easement grant that limits both the facilities that VEPCO may place on the easements and the purposes for which VEPCO may use those facilities.

The Class Certification Appendix categorizes the easement grants and provides a summary of the purpose clause language in each category, while the Summary Judgment appendix additionally provides complete examples of the easement grants in each category. An exemplary purpose clause, from Category I of the Summary Judgment Appendix, grants VEPCO an easement:

to construct, operate and maintain one or more lines of poles, towers or structures, as [VEPCO] may from time to time deem expedient and advisable, located on the right of way hereinafter described for the purpose of transmitting electric power by one or more circuits, including all wires, poles, towers, attachments, ground connections, equipment accessories and appurtenances desirable in connection therewith ... over, upon and across the lands of Owner ...

(Summary Judgment Appendix Tab I(B) Form No. 101–B). Other categories may contain markedly different language in the purpose clause. Category VIII, for example, contains so-called "communication purposes" language in a purpose clause that grants VEPCO an easement:

to lay construct, operate and maintain one or more lines of poles, towers, structures, cables, conduits, pipes and mains, together with all wires, manholes, handholes, valves, regulators, meters, attachments, equipment, accessories and appurtenances desirable in connection therewith ..., for the purpose of transmitting or distributing electric power, for the purpose of transporting natural gas, oil, petroleum products or any other liquids, gases or substances which can be transported through a pipe line, and for communication purposes.

(Summary Judgment Appendix Tab VIII(A) Form No. 556.95).

Notwithstanding the variation in language among the easement categories, the Plaintiffs contend that the two appendices summarize the universe of easement language that the Court will need to address to determine the scope of all the potential class members' easements. The Plaintiffs assembled both appendices by reviewing the fiber optic network system maps and the approximately 4100 easement documents that the Defendants produced during discovery. According to the Plaintiffs, this review progressed as follows.

On August 12, 2002, the Plaintiffs served discovery requests on the Defendants who, in September, began producing relevant documents for inspection and copying. The original production included 41 boxes of documents responsive to the Plaintiffs' requests for, *inter alia:* (1) "[a]ll maps or other documents showing the location of defendants' fiber optic cable network;" (2) the identity of all landowners along the network; and (3) "[a]ll easements or other documents giving either defendant the right to enter upon land in Virginia or North Carolina for any purpose, where defendants have installed or planned to install fiber optic cable on such land." (Pl.'s Reply Br. In. Supp. Mot. SJ, Att. A ("Pace Decl.") ¶ 5, Exh. 1).

Discovery was stayed in this action from September 20 until October 17, 2002, at which time the Plaintiffs' document review continued until October 25, 2002. (Id. ¶ 16). On November 20, 2002, the Defendants produced an overview fiber optic network map and, by January 10, 2003, the Plaintiffs completed a 136–page preliminary analysis that catalogued approximately 3,780 right-of-way documents and the various types of relevant easement language. (Id. ¶¶ 8–10).

On March 3, 2003, after the Plaintiffs had analyzed and catalogued the 3,780 right-of-way documents that the Defendants had produced, and with the Plaintiffs' motion on class certification due 11 days later, the Defendants first gave notice that, in their view, VEPCO's records were both under and over inclusive in that the land described in some of the produced easement documents did not underlie OPGW and some easements that did underlie OPGW were not in VEPCO's files. Also, on March 3 and 6, 2003, the Defendants produced additional fiber optic network maps and profiles and 320 additional right-of-way documents. (Id. ¶¶ 11–13; Defs.'s Resp. Opp. Mot. Class. Cert. Walker Decl. Exhs. 2, 3). With these additional disclosures, the Plaintiffs reassessed the easement documents and determined that, of the approximately 4100 right-of-way documents produced, only approximately 2200 respect land that potentially underlies VEPCO's OPGW. The Class Certification Appendix and Summary Judgment Appendix purport to summarize these 2200 relevant conveyances. In total, the Defendants produced approximately 4100 right-of-way documents of which approximately 19% contained "for

communication purposes" type language and approximately 2% were executed after January 1, 1985. (Pace Decl. ¶ 12).

The Defendants contend that the appendices do not accurately represent all of the relevant easements and easement language necessary to resolve the ultimate question of their rights to install and operate a commercial fiber optic network on the class land. According to the Defendants, the appendices are infirm for five reasons.

First, the Plaintiffs have categorized the conveyances based only on the purpose clause in each easement grant. Citing *Hise v. BARC Elec. Coop.*, 254 Va. 341, 492 S.E.2d 154 (1997), the Defendants argue that, although the purpose clause is relevant, the determination of the property rights in this action will require the Court to examine each easement document as a whole. In *Hise*, the Supreme Court of Virginia considered the scope of an electric power company's rights in an easement in gross. The issue was whether the power company could permit a telephone company and a cable company to attach their lines to the power company's poles without first obtaining consent from the servient landowners. The Court determined that the answer depended on whether the easement in gross was exclusive. An exclusive easement in gross gives the easement owner the sole privilege of making the uses that the easement authorizes and, therefore, may give the owner a right of apportionment. *Hise*, 254 Va. at 344, 492 S.E.2d 154. Apportionment is the right to divide an easement in gross so as to produce independent uses or operations. *Hise*, 254 Va. at 344–45, 492 S.E.2d 154. In determining whether the easement was exclusive, the Court examined the easement's purpose clause, as well as: (1) an improvements clause, which allowed the power company to alter its facilities located on the easement, and (2) a reservations clause, which set forth the limited rights that the servient landowners retained in the easement land. The Defendants assert that these same provisions are relevant in this action, as well as other provisions that the *Hise* court did not address, and the easements in VEPCO's files exhibit varying language in these provisions, which the appendices do not capture.

Second, the Defendants point out that some easements were individually negotiated and, as a result, a number of the conveyances contain various alterations to the ostensibly standard forms. Such individually negotiated changes appear in a number of the exemplary easement documents that the Plaintiffs included in the Summary Judgment Appendix. (*See, e.g.,* Summary Judgment Appendix, Tab I(A); Tab I(B); Tab IV; Tab VI(B); Tab VII(A); Tab IX). The Defendants claim that such individual negotiations create a number of variations among the easements within each of the categories in the Plaintiffs' appendices.

Third, the Defendants point out that there are variations between the easements recorded in the land records and those that the Plaintiffs obtained in discovery from VEPCO's files. The only examples that the Defendants provide of this sort of variation concern commas that are occasionally present in the VEPCO file copy of the easements, but absent from the recorded instruments. The Defendants assert that the Court cannot determine whether such variations are material at this stage because a decision on the merits cannot precede the class certification determination.

Fourth, the Defendants assert that some relevant conveyances were not included in VEPCO's files and therefore are not reflected in the appendices. In addition, the Amended Complaint mentions certain easements that VEPCO obtained by condemnation, which the appendices do not reflect.

Finally, the appendices are based entirely on documents from the Defendants' files and the Defendants assert that at least some of those documents are inadmissible. According to the Defendants, when an original grantor asserts a claim, the original easements in VEPCO's files are the operative document, but when a subsequent purchaser asserts a claim, the recording statutes in both Virginia and North Carolina dictate that the document recorded in the land records is the operative instrument. (Resp. p. 11–12) (citing Va.Code § 55–95; N.C.G.S. § 47–27). The Defendants also assert that, where the

documents in VEPCO's files are not the operative instrument, the file documents are inadmissible hearsay.

None of these contentions undermine the utility of the Plaintiffs' appendices. Although, the Defendants have pointed out that certain variations in easement language exist, the record does not indicate that any such variations are likely to have a material impact on whether the commercial fiber optic network is a permissible use of the easements and the Defendants have made no effort to quantify how often any of the variations occur or how the variations are material. Although the Defendants have asserted that certain relevant easement documents were not in VEPCO's files and therefore were not included in the document production and are not reflected in the appendices, the Defendants, who have superior knowledge on the question, have offered no evidence as to how many documents are missing or whether they materially differ from those that the Plaintiffs have already reviewed and summarized.[1]

Finally, even if the *Hise* decision requires the Court to examine additional easement provisions not categorized in the appendices, the Defendants have made no effort to quantify the variations in those provisions. Whatever the quantity, it appears that such variations, like those in the purpose provision, are amenable to categorization should it become necessary. (*See* Walker Decl. (Defendants' declarant asserting that there should be numerous subcategories to recognize the variations in the additional provisions)).

In sum, the Defendants have not identified any variations in easement language that are both material and occur with such frequency as to pose a substantial obstacle to construing the easement grants on the categorical basis that the Plaintiffs propose in their appendices and case management plan. Should subsequent inquiry prove otherwise, Rule 23 permits a court to certify a class conditionally and decertify the class where appropriate.

*See Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir.1993) (advising a court to reconsider its conditional certification where the class "no.longer promises to achieve economies of scale on common issues"); *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir.1990) ("An order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate.").

As to the Defendants evidentiary concerns, there has been no motion to strike either appendix. And, in any event, the appendices summarize the Defendants' voluminous business records and are therefore admissible under the Federal Rules of Evidence, which provide that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed. R. Ev. 1006. The Plaintiffs assembled both appendices based on business records that the Defendants produced in response to discovery requests seeking, *inter alia*, all documents on which the Defendants based their right to install and operate a fiber optic network on the class land. Business records are an exception to the hearsay rule under Rule 803(6) of the Federal Rules of Evidence. Moreover, the Virginia and North Carolina recording statutes on which the Defendants rely respect notice to subsequent purchasers and are inapplicable in an action of this sort.

### 3. Situating The Easements, The Class Land, And The OPGW

There is no dispute that VEPCO holds easements that burden the Named Plaintiffs'

---

1. As earlier explained, VEPCO first made this assertion some seven months after its initial production of approximately 3,780 right-of-way documents and 11 days before the Plaintiffs' opening class certification brief was originally due. Considering those circumstances and the Defen-

dants' superior knowledge and access to the information, it was incumbent upon them to do more than point out the problem if they thought it was truly an impediment to the reliability of the Plaintiffs' evidence.

land, that VEPCO has installed OPGW on certain of those easements, and that the Defendants are using that OPGW to operate a commercial fiber optic network for purposes unrelated to transmitting and distributing electric power. There is some dispute, however, as to how one determines which parcel and which easement underlie the OPGW. The Defendants assert that these determinations invariably will require a survey, which, given the thousands of parcels at issue, will render the class unmanageable because class member identification and notice cannot be accomplished within a reasonable time. The Plaintiffs respond that, although the Defendants commissioned surveys on the Named Plaintiffs' land, such surveys will rarely, if ever, be required. Reviewing the background and arrangement of the Named Plaintiffs' land is illustrative of the dispute.

### a. The Fishers

The Amended Complaint alleges that the Fishers own land in Nash County, North Carolina (tax parcel # 3864) that is subject to three separate VEPCO easements. (Am. Compl.¶¶ 1, 19). The Fishers' predecessors in interest granted two adjacent easements, each 100 feet wide, to VEPCO in 1926 and 1927 respectively. (Am.Compl.Exhs.A, B). The Fishers granted a third easement, 50 feet wide, to VEPCO in 1965. (Am. Compl.Exh. C). The third easement runs parallel to each of the previously existing 100 foot easements, effectively increasing the overall easement width to 150 feet (Am. Compl.¶ 19).

The Defendants have submitted the declaration of a licensed surveyor, George L. Nyfeler, III, who supervised a survey of the Fisher's property to ascertain the exact location of any OPGW. (Def.'s Resp. Decl. Book Nyfeler Tab) ("Nyfeler Decl."). Nyfeler conducted the survey based on the easement deeds, a 1926 VEPCO Plan and Profile map, a 1965 VEPCO Plan and Profile map, and several land conveyances to the Fishers from their predecessors in interest. (Nyfeler Decl. ¶ 9). Appended to Nyfeler's declaration are the results of his survey—plats that purportedly depict VEPCO's easements and utility lines, including OPGW, relative to the Fisher's land. (Nyfeler Decl. ¶ 9, Exh. G).

In contrast with the three easements described in the Amended Complaint, Nyfeler's plats depict three separate, adjacent easements (100 feet wide) each with a separate, parallel easement (50 feet wide) for a total of six easements. The significance of the actual number of easements burdening the Fisher land is that each separate easement may result from a separate granting document. Each granting document potentially contains different granting language. Where the granting language differs, it is possible that the property rights conveyed differ as well, which means the Fisher land could contain as many as six different easements of varying legal scope.

According to Nyfeler, due to certain inconsistencies in the documents he reviewed in preparing his initial survey, it was impossible to determine which easement underlies the OPGW without a field survey. (Nyfeler Decl. ¶¶ 10,11). Nyfeler conducted some field work and found that the weight of the evidence indicates that the OPGW is only present within the three adjacent 100 foot easements. Thus, none of the parallel 50 foot easements contain any OPGW. (Nyfeler Decl. ¶ 11, Exh. G). According to the Defendants, if Nyfeler is correct, contrary to the allegations in the Amended Complaint, none of the 50 foot easements on the Fisher's land are relevant in this action. That conclusion, however, is incorrect.

Like the Fishers, any potential class member may have land burdened by multiple VEPCO easements, only a subset of which contain OPGW. But the class definition includes all those whose land underlies VEPCO's fiber optic network. Thus, it is the presence of OPGW on the land that is burdened by the easement that dictates class membership, not the presence of OPGW at a specific location·within a particular easement. Once the presence of OPGW is established, the landowner may seek injunctive and declaratory relief with respect to any and all VEPCO easements burdening his or her land, irrespective of whether VEPCO has already installed OPGW on such easements. Thus, all VEPCO easements that burden

class land remain relevant to the class claims seeking injunctive and declaratory relief even if those easements do not currently contain OPGW, so long as OPGW lies on some portion of the land so as to render the landowner a class member. Nevertheless, the issue of which easement actually underlies the OPGW is relevant to the claims for damages and therefore must be ascertained at some point in the litigation.

### b. The Tomlinsons

The Amended Complaint alleges that the Tomlinsons own land in Greensville County, Virginia (tax parcel 43–3), that is subject to an easement, 150 feet in width, which their predecessors in interest granted to VEPCO in 1930. (Am. Compl. ¶¶ 2, 23 & Exh. D). In 1985, the Tomlinsons and their predecessors in interest conveyed a portion of their property to Tidewater Timber Company, Inc ("Tidewater"). That conveyance described one land boundary point as the "center line of the Power line." (Am.Compl.Exh. E). As a result, the Tomlinson land is subject to only 75 feet of VEPCO's 150 foot wide easement that runs the length of the land. In the Amended Complaint, the Plaintiffs alleged that "[u]pon information and belief" the fiber optic cable is within the half of the easement that burdens the Tomlinson's land. (Am. Compl.¶ 24).

Nyfeler conducted a survey based on the deed granting the 150 foot easement to VEPCO, the 1962 VEPCO Plan and Profile map, and several conveyances involving Tidewater. (Nyfeler Decl. ¶ 4). Nyfeler's survey revealed that the OPGW actually does lie on the Tomlinson's land by about 10 feet, but Nyfeler avers that, as with the Fisher's land, it was impossible to reach that conclusion without first conducting a field survey. (Nyfeler Dec. ¶ 8).

The real purpose of the Defendants' contentions is to show that class membership, and hence notice, cannot be determined without a survey of each class member's land. That issue is discussed more fully below, but, for now, it is sufficient to note that the Plaintiffs have shown that such instances likely will be rare and that, in any event, information provided by VEPCO in discovery and certain technological developments make it rather easy to ascertain the location of the OPGW within an easement.

### LEGAL DISCUSSION

Rule 23 governs class actions in the federal courts. Rule 23(a) states the threshold requirements applicable to all class actions while Rule 23(b) sets forth additional requirements for each of the three alternate types of class actions. Thus, the class certification analysis must proceed in a two-stage fashion. First, a party seeking class certification must show that the action will meet all four requirements of Rule 23(a). Then, assuming that those threshold requirements are met, that party must also carry the burden to show that the action will meet the requirements of at least one part of Rule 23(b). *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

The practice in the Fourth Circuit is "to give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application [that] will in the particular case best serve the ends of justice for affected parties and promote judicial efficiency." *In re A.H. Robins Co., Inc.,* 880 F.2d 709, 740 (4th Cir.1989), *cert denied sub nom. Anderson v. Aetna Cas. & Sur. Co.,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (quotations omitted), abrogated on other grounds *Amchem,* 521 U.S. 591, 117 S.Ct. 2231; *see also Jeffreys v. Communications Workers,* 212 F.R.D. 320, 322 (E.D.Va.2003). Although Rule 23 must receive a liberal construction, in applying the rule, it is the district court's responsibility to perform "a rigorous analysis of the particular facts of the case." *In re A.H. Robins,* 880 F.2d at 728. Before applying the two-stage class certification analysis to the facts in this action, however, it instructive to ascertain how other federal courts have applied Rule 23 when faced with generally similar factual scenarios.

To that end, Section I of this Memorandum Opinion provides a summary of the Rule 23 requirements. Section II addresses several decisions where the federal courts have applied Rule 23 in analogous circumstances. Section III applies the Rule 23 analysis to

the facts of this action in light of the conclusions evident from the prior two sections.

## I. Class Certification Requirements

The party seeking certification must bear the burden to establish that the action meets the requirements for class certification. *In re A.H. Robins*, 880 F.2d at 728. There is some question whether, in addressing class certification, the court should consider the merits of the case or instead credit the facts alleged in the complaint. *Compare Shelton v. Pargo*, 582 F.2d 1298, 1312–13 (4th Cir. 1978) ("In resolving the issue of class certification, the court may not confine itself to the allegations of the complaint. An intelligent decision on class certification requires 'at least a preliminary exploration of the merits' of the plaintiff's claim."); *Ostler v. Level 3 Communications, Inc.*, No IP 00–0718–C, 2002 WL 31040337 (S.D. Ind. Aug 27, 200) ("In deciding whether to certify a class, the court is not required to accept the allegations in the complaint as true. The court should make any factual and legal inquiries that are needed to ensure that the prerequisites and requirements for class certification are satisfied, even if the underlying considerations overlap the merits of the case.") (citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675–76 (7th Cir.2001); *In re Bromine Antitrust Litigation*, 203 F.R.D. 403, 407 (S.D.Ind.2001)) *with Jeffreys*, 212 F.R.D. at 322 (E.D.Va.2003) ("To determine if a class should be certified, the court 'should accept as true the plaintiff's allegations concerning the merits of the case.'") (quoting *Labbate–D'Alauro v. GC Serv. Ltd. P'Ship*, 168 F.R.D. 451, 454 (E.D.N.Y.1996)); *Talbott v. GC Servcs. Ltd. P'Ship*, 191 F.R.D. 99, 101 (W.D.Va.2000).

In *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Supreme Court of the United States held that Rule 23 did not give a district court the authority to conduct a preliminary hearing into the merits of a suit in order to determine whether class certification is appropriate. The Court reasoned that such a procedure would allow a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it. *Id.* Eschewing a preliminary inquiry into the merits and accepting the allegations in the complaint as true, however, accords the same benefits to the plaintiff with even less deference to the defendant's position. In light of the conflicting precedent, the Court will inquire no further into the merits than is necessary to determine the likely contours of this action should it proceed on a representative basis. *See Brown v. Cameron–Brown Co.*, 92 F.R.D. 32, 37 (E.D.Va.1981) ("while the court may not put the plaintiff to preliminary proof of his claims, it may require such supplements to the pleadings to allow an informed judgment on each of the [Rule 23] requirements.").

### A. Rule 23(a) Requirements

Under Rule 23(a), every class action must meet four threshold requirements: (1) numerosity, which is undisputed in this action and will not be discussed further,[2] requires that the class be so large that joinder of all class members is impracticable; (2) commonality—there must exist questions of law or fact that are common to the class; (3) typicality—the named plaintiffs' claims must be typical of the class; and (4) adequacy of representation—the class representatives must be capable of fairly and adequately protecting the interests of the absent class members. *Amchem*, 521 U.S. at 613, 117 S.Ct. 2231. Again, these requirements are construed liberally to achieve the purposes for which Rule 23 was promulgated, *Jeffreys*, 212 F.R.D. at 322, but are nonetheless assessed rigorously to assure that the rule is neither abused nor applied where it should not be. *In re A.H. Robins*, 880 F.2d at 728.

#### 1. Commonality

■ A proposed class will satisfy the Rule 23(a)(2) commonality requirement if there is at least one question of law or fact common to the class. *Jeffreys*, 212 F.R.D. at 322. "This subsection does not require that all, or

---

2. The Defendants concede, and it is manifest, that this action meets the numerosity requirement because there are approximately 695 linear miles of OPGW at issue and, as a general matter, multiple landowners per each mile, resulting in several thousand potential class members.

even most, issues be common, nor that common issues predominate, but only that common issues exist." *Central Wesleyan,* 143 F.R.D. at 636. The mere presence of some factual variances in individual grievances, such as in the extent of injuries and damages, will not defeat class certification. *Jeffreys,* 212 F.R.D. at 322.

## 2. Typicality

■ The typicality and commonality requirements of Rule 23(a)(2) and (3) ensure that only those plaintiffs who can advance the same factual and legal arguments may be grouped together as a class. *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 340 (4th Cir.1998). Where the commonality requirement focuses on the claims of the class as a whole, the typicality requirement is focused on the claims of the named plaintiffs. " 'The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class.' " *Broussard,* 155 F.3d at 340 (quoting *Sprague v. General Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998), *cert. denied,* 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998)). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 146 (4th Cir.2001). Nevertheless, the class representatives and the class members need not have identical factual and legal claims in all respects. *Broussard,* 155 F.3d at 344. The proposed class satisfies the typicality requirement if the class representatives assert claims that fairly encompass those of the entire class, even if not identical. *Broussard,* 155 F.3d at 344 (*citing Sprague,* 133 F.3d at 399).

■ In sum, to establish typicality, the class representatives must show: (1) that their interests are squarely aligned with the interests of the class members; and, (2) that their claims arise from the same events or course of conduct and are premised on the same legal theories as the claims of the class

members. *Jeffreys,* 212 F.R.D. at 322; *McGlothlin v. Connors,* 142 F.R.D. 626, 633 (W.D.Va.1992). Some factual variations between the class members is not fatal to typicality. *McGlothlin,* 142 F.R.D. at 633. For instance, factual variances in the claimed damages, or differences in the availability of certain defenses, do not defeat typicality, so long as the class claims are based on the same legal or remedial theory. *Jeffreys,* 212 F.R.D. at 322.

## 3. Adequacy of Representation

The adequacy-of-representation requirement serves to uncover conflicts of interest between the named parties and the class they seek to represent.[3] *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231. This requirement tends to merge with the commonality and typicality criteria, which serve as guideposts for determining whether the class action is economical and whether the named plaintiffs' claims are so interrelated with the class claims that the named plaintiffs will adequately protect the interests of the absent class members. *Amchem,* 521 U.S. at 626 n. 20, 117 S.Ct. 2231; *General Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Basic due process requires that the named plaintiffs possess undivided loyalties to absent class members. *Broussard,* 155 F.3d at 338. Even if the class representatives are adequate representatives for all class members on the issue of liability, a conflict between the class members and the class representatives respecting the appropriate relief may preclude class certification on the issue of damages. *Broussard,* 155 F.3d at 337.

## B. Rule 23(b) Requirements

Here, the plaintiffs seek certification under Rule 23(b)(2) and, in the alternative, under Rule 23(b)(3). If a class action is maintainable under subsection (b)(2) and also under (b)(3), a court should certify the action under (b)(2), "so that judgment will have *res judicata* effect as to all the class." *In re A.H.*

---

3. The adequacy heading also factors in the competency and conflicts of class counsel, *Amchem,* 521 U.S. at 626 n. 20, 117 S.Ct. 2231, but the Defendants here do not challenge the adequacy

of class counsel. (Resp. p. 37 ("Defendants do not question class counsel's expertise and experience.")).

*Robins,* 880 F.2d at 728; *McGlothlin,* 142 F.R.D. at 640 ("When both provisions apply, the court should proceed under Rule 23(b)(2) so that all the class members will be bound."). This is because, in an action certified under (b)(2), "no member has the right to opt out." *Id.* In an action certified "under (b)(3), however, any class member may opt out." *Id.*

### 1. Rule 23(b)(2) Requirements

■ If the Plaintiffs carry their burden to establish that this action meets the threshold criteria of Rule 23(a), certification under Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2). Rule 23(b)(2) does not cover cases where the primary claim is for damages, *Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594, 595 (4th Cir.1976), it is applicable only where the relief sought is exclusively or predominately injunctive or declaratory. *Id.*

■ Nevertheless, Rule 23(b)(2) certification remains available when a claim for injunctive or declaratory relief also includes a claim for money damages so long as the requested damages are "incidental" to the requested injunctive or declaratory relief. *Lemon v. Int'l Union of Operating Eng'rs.,* 216 F.3d 577, 581 (7th Cir.2000). Incidental damages are those that flow directly from liability to the class as a whole on the claims that form the basis of the injunctive or declaratory relief. *Id.* Such damages are distinguishable in that they "do not depend 'in any significant way on the intangible, subjective differences of each class member's circumstances' and do not 'require additional hearings to resolve the disparate merits of each individual's case.'" *Id.* (quoting *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998)).

---

4. The other three factors are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by

### 2. Rule 23(b)(3) Requirements

Certification under Rule 23(b)(3) is appropriate where the court finds: (1) that the questions of law or fact common to the class members predominate over any questions affecting only individual members; and, (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed.R.Civ.P. 23(b)(3). Although Rule 23(b)(3) lists four matters pertinent to the predominance and superiority findings, the parties have addressed themselves to but one—manageability. *See* Fed.R.Civ.P. 23(b)(3)(D) (directing the court's attention to "the difficulties likely to be encountered in the management of a class action.").[4]

■ The predominance test requires the court to determine whether the common questions of law or fact predominate over any questions affecting only individual class members. The question is whether the class is cohesive enough to warrant adjudication by representation. *Jeffreys,* 212 F.R.D. at 323. Differences in damages among the potential class members do not defeat predominance if liability is common to the class. *Jeffreys,* 212 F.R.D. at 323.

The superiority inquiry tests whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed.R.Civ.P. 23(b)(3). The manageability consideration is but one of the "nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria." *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231. Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen,* 417 U.S. at 164, 94 S.Ct. 2140. As the Fourth Circuit has explained it is a:

firmly established principle that the issue of manageability of a proposed class action is always a matter of "justifiable and serious" concern for the trial court and pecu-

---

or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum. Fed. R.Civ.P. 23(b).

liarly within its discretion. This is so because the issue is one of fact, subject to determination by the district court; it is "a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise than does a court of appeals. Consequently, it is an area in which the trial court must of necessity be granted a wide range of discretion."

*Windham v. American Brands, Inc.,* 565 F.2d 59, 65 (4th Cir.1977) (en banc) (quoting *Link v. Mercedes–Benz of N. Am., Inc.,* 550 F.2d 860, 864 (3rd Cir.1977) *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977)).

### C. Alternate Certification Options

Even if the money damages that the plaintiffs seek are more than incidental to the equitable relief, subsection (b)(2) class certification remains available under two options that the parties have not addressed—divided certification and composite certification.

■ Divided certification allows a court to certify the equitable aspects of a suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3), thereby "achieving both consistent treatment of classwide equitable relief and an opportunity for each affected person to exercise control over the damages aspects." *Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894, 898 (7th Cir.1999). "This avoids the due process problems of certifying the entire case under Rule 23(b)(2) by introducing the Rule 23(b)(3) protections of personal notice and opportunity to opt out for the damages claims." *Lemon,* 216 F.3d at 581.

■ Instead of divided certification, a district judge may grant composite certification. Composite certification allows a court to certify the class under Rule 23(b)(2) for both monetary and equitable remedies and exercise its plenary authority under Rules 23(d)(2) and 23(d)(5) to provide all class members with personal notice and the opportunity to opt out, as if the class were certified under Rule 23(b)(3). *Lemon,* 216 F.3d at 582; *Jefferson,* 195 F.3d at 898.

### II. Comparison With Other Decisions Involving Fiber Optic Easements

Citing a number of federal decisions, the Defendants contend that "[n]o federal court has successfully certified a litigation class in a fiber optic easement case." Far from contraindicating class ·certification, however, a comparison between this action and the cited decisions illustrates that, although the factual scenarios are similar, the legal inquiries necessary to resolve this action and the manner in which the Plaintiffs have presented their case differ from the circumstances in those decisions where class certification may not have been appropriate. In addition, the Plaintiffs cite persuasive authority favoring class certification in actions such as this. Discussion of a number of the more relevant decisions follows.

#### A. *Isaacs*

In *Isaacs v. Sprint Corp.,* 261 F.3d 679 (7th Cir.2001), Sprint had purchased, from certain railroads, the right to install fiber optic cable on railroad rights-of-way in every state of the continental United States. The plaintiffs, who owned land adjacent to the rights-of-way, claimed that the rights that Sprint had acquired belonged to them rather than to the railroads and, for that reason, the plaintiffs sought damages for the conversion. *Id.* at 680–81. The district court certified two classes, one consisting of landowners adjacent to those rights-of-way obtained by condemnation and the other for landowners adjacent to those rights-of-way obtained by grants of public land to railroads. *Id.* The Seventh Circuit reversed because the district court had failed to make any of the determinations that Rule 23 requires and also because certification seemed wholly inappropriate. *Id.* at 681–82. The Court explained that:

> The case involves different conveyances by and to different parties made at different times over a period of more than a century ... in 48 states (plus the District of Columbia) which have different laws regarding the scope of easements ... laws moreover that have changed over the period embracing the grant of property rights to railroads ... and whose application in-

volves intricate legal and factual issues … making it unlikely that common issues predominate over individual claim issues. This is a nightmare of a class action.

*Id.* at 682 (citations omitted).

The facts here, however, are not so foreboding. Although this action involves different conveyances, the variations are limited and appear to be, as the Plaintiffs allege, substantially similar in all material respects.[5] And, although the easements at issue commenced from over 2000 separate conveyances over a period of about eighty years, VEPCO was the common acquiring party in each transaction. In addition, unlike the 49 jurisdictions under examination in *Isaacs,* the laws governing the scope of the easements here at issue come from only two States and there is, as yet uncovered, no appreciable difference between them. Nor is there any indication that applying that law will involve the sort of intricate legal and factual issues that the Seventh Circuit feared.

In short, this action is only similar to *Isaacs* in a general manner—in both actions the defendants installed fiber optic cable on numerous rights-of-way. The two actions are otherwise so dissimilar that the abbreviated analysis in *Isaacs* does not dictate the result here that obtained there.

### B. *Ostler*

In *Ostler v. Level 3 Communications, Inc.,* No. IP 00–0718–C, 2002 WL 31040337 (S.D.Ind. Aug.27, 2002), Level 3 had buried 465 miles of fiber optic cable near or in rights-of-way for public roads in several counties in Indiana and the plaintiffs sought to certify a statewide class of landowners who lived along Level 3's fiber optic cable corridor. *Id.* at *1. The plaintiffs claimed that the fiber optic cable installation exceeded the legal and physical scope of the public rights-of-way, which, in the plaintiff's view, were limited to the traveled portion of the road. *Id.* at *2.

The *Ostler* court found that the plaintiffs satisfied all the Rule 23(a) requirements, pri-

marily because Level 3 had engaged in a common course of conduct directed toward all potential class members and because all class members would assert the same cause of action. The court found that the class met the Rule 23(a) requirements notwithstanding Level 3's ability to raise different defenses against different class members and notwithstanding differences among the named plaintiffs respecting the nature and source of their individual property rights. *Id.* at *3–5.

Although the plaintiffs in *Ostler* sought certification under each part of Rule 23(b), the court found only Rule 23(b)(3) applicable because the plaintiffs sought substantial monetary compensation. *Id.* at *5. Proceeding with the Rule 23(b)(3) analysis the court found that all of the factors weighed in favor of certification except the Rule 23(b)(3)(D) manageability factor, which the court found singularly "decisive." *Id.* at *6. The court found the case unmanageable, agreeing with Level 3 that individualized questions about the scope of each landowner's rights predominated over any common questions respecting Level 3's conduct. *Id.* at *6–7.

The plaintiffs in *Ostler* argued in response that: (1) the analysis was "upside-down" because it improperly focused on the individual issues first rather than the common issues; (2) the only way to deal effectively and economically with the landowners was to treat them as a group and make broad determinations about the common issues; and, (3) class actions should not be defeated simply because the defendant had wronged so many individuals that complexities arose. *Id.* at *9. The Plaintiffs here have asserted the same arguments. The *Ostler* court found that, although these points had considerable force, they could not overcome the Seventh Circuit's precedent rejecting class certification in the face of a need for individualized determinations of each potential class member's rights. *Id.*

*Ostler* is distinguishable for two reasons. First, the individualized inquiries necessary in *Ostler* far exceed those required to resolve this action. The *Ostler* plaintiffs premised

---

5. A determination of the meaning of the easements is neither necessary nor appropriate at this stage of the proceedings. However, an examination of the text of the several categories discloses this similarity.

their trespass claims on Level 3's actions that were allegedly outside the *physical* scope, as well as the *legal* scope, of the rights-of-way. *Id.* at *1. Thus, each class member's title and the precise physical location of the fiber optic cable were of primary importance in determining liability as well as class membership. *Id.* at *6, *9. In addition, the source of each potential class members' property rights varied drastically: some landowners conveyed rights-of-way by deed to the State of Indiana; the State established other rights-of-way by prescription, which of course required fact-intensive inquiry; and, other rights-of-way were established long ago by a treaty between the United States and the Pottawattamie Native–American tribe. *Id.* at *6–7.

Here, there is no allegation that the Defendants have exceeded the physical scope of the easements, only the legal scope. And, far from the multifarious sources of property rights present in *Ostler*, the easements here are the product of a limited set of substantially similar conveyances. Although individual questions respecting property rights exist here, as is inevitable in any class action involving land, such questions are not nearly as extensive as those present in *Ostler* and they certainly do not predominate. As explained hereafter, the need for individual review with respect to class identification and notice does not prevent certification where common questions predominate.

Second, the *Ostler* Court did not explain why Rule 23(b)(2) certification was unavailable. The court noted that the plaintiffs sought "substantial monetary compensation," but it did not explain why that compensation was not merely incidental to the equitable relief sought. *Id.* at *5. Here, should the Plaintiffs succeed on their claims for declaratory and injunctive relief, and if, as the Plaintiffs allege, it is appropriate to measure damages on a dollar-per-foot basis, individual hearings will not be necessary on either entitlement to damages or on the amount of individual damages. With respect to punitive damages and damages for unjust enrichment, the Plaintiffs' case is premised on the theory that the Defendants chose not to individually negotiate with any potential class members, but instead took actions to the detriment of the class as a whole. Simply put, the facts and legal theories in this action differ drastically from those that guided the *Ostler* decision.

## C. Chambers

In *Chambers v. MCI WorldCom Network Services, Inc.*, No. 00–C–348–C (W.D.Wisc. Mar. 2, 2001), the plaintiffs asserted claims for trespass and unjust enrichment, alleging that the defendants had installed fiber optic cable beneath the railroad rights-of-way that ran across the plaintiffs' property. According to the plaintiffs, the fiber optic cable installation exceeded the scope of the rights-of-way, which, in the plaintiffs view, were limited to the sole purpose of operating a railroad. *Id.* at 1–2. The plaintiffs sought to certify a class of all Wisconsin landowners who owned land on the side of the rights-of-way where the defendants installed the fiber optic cable and who did not consent to the installation.

The court in *Chambers* first found that the class definition was insufficient because the class was not presently ascertainable without extensive factual inquiry and without inquiry into the merits of the action. First, apparently because the class was limited to those who did not give consent to the installation, the court concluded that it had to determine "whether the adjoining landowner was the appropriate person from whom to obtain consent." *Id.* at 11. It is unclear why the court believed that it was necessary to broach this question to determine class membership. The class definition required only that the adjoining landowner did not give consent, not that the defendants were legally required to seek it. Whether consent was legally required was certainly a question that went to the merits of the action—requiring the court to determine who owned each affected parcel and what type and scope of property rights were associated with each parcel—but there does not seem to have been any basis to import that question into the class membership determination.

Second, the court found that it was "not sufficient that a person own land adjacent to the cable side right of way: that person must

establish also that he or she owns the underlying (or superior) interest in the right-of-way where the railroad owns less than a fee simple absolute." *Id.* at 12. Again, the court imported extraneous legal questions into the class definition, which required only that the landowner "own property adjacent to a railroad right of way under which MCI has installed fiber optic cable," not that each class member's property right be superior to all others. *Id.* at 8. In any event, the court determined that the class definition required extensive factual inquiry to match the parcels containing fiber optic cable with the current landowners and to determine the nature of the applicable property rights.

Here, unlike *Chambers,* only one sort of property right is at issue—VEPCO's easements, which contain express language delineating the easement's scope. And, although the process of matching the parcels containing fiber optic cable to class members and particular easements is not without complication, as further explained herein, that is a matter of class identification, notice and class membership and claims administration, addressable through purely objective criteria, and is not a circumstance that undermines class certification. Moreover, the current record suggests that the complications are not nearly as difficult as the Defendants contend.

Addressing itself to the Rule 23(a) prerequisites, the *Chambers* court found that, although the action met the numerosity and commonality requirements, it did not satisfy the typicality and adequacy of representation requirements because: (1) the property interests involved arose from a large number of different types of instruments; (2) even if the court could divide the instruments into a limited number of categories, it would have to resolve the consent issue separately for each class member; and (3) the statute of limitations applied differently depending on each class member's circumstances. *Id.* at 19–21. The Plaintiffs here have also provided evidence that all the relevant conveyances fall into a limited number of categories and there is no evidence that consent or the statute of limitations are an issue for more than a handful of the potential class members. Moreover, the law in this circuit is that differences in the availability of certain defenses do not defeat class certification where, as here, all the class claims are based on the same legal and remedial theory. *Jeffreys,* 212 F.R.D. at 322.

Although the *Chambers* court previously had held that the action "meets the 'highly permissive' standard of commonality," *Id.* at 17, later, when addressing the Rule 23(b)(3) requirements, it inexplicably held that the action did not meet the predominance test because predominance is "more demanding than the commonality requirement that the proposed class fails to meet." *Id.* at 22. This contradiction aside, the court also found the proposed class unmanageable because the class claims required the Court to:

(1) analyze thousands of acquisition documents and possibly perform as many chain of title searches to determine the competing interests of each class member and the railroad rights-of-way; (2) determine whether each class member or a previous landowner consented to installation of the cable; and (3) assess damages to each class member's property.

*Id.* at 22. The Court believed the enumerated tasks would necessitate thousands of mini-trials. *Id.*

The circumstances in this action do not present the dangers that the *Chambers* court perceived. Here, determining the relevant property interest will require analysis of only a limited array of easement language and the vast majority of the conveyances at issue contain substantially similar language. The record reflects that consent will be an issue in no more than a handful of instances, and possibly only one. And, it appears likely that it will be appropriate to compute damages on a classwide, dollar-per-foot, basis rather than to individually assess damages to each class member's property. And, even if it is not, Rule 23 allows for certification on the liability issues alone.

In sum, the decision in *Chambers* was heavily dependent on the class claims having arisen from numerous unrelated conveyances of varying type and scope as well as the Court's conclusions respecting a class definition that excluded consenting landowners and

otherwise differed from the class definition at issue in this action. As a result, the decision in *Chambers* does not provide a predicate for analysis that is reasonably applicable here.

### D. *Nudell*

In *Nudell v. Burlington Northern and Santa Fe Railway Co.*, No. A3–01–41, 2002 WL 1543725 (D.N.D. July 11, 2002), the plaintiffs owned land subject to federally-originated railroad rights-of-way on or under which Sprint Communications Company had installed fiber optic cable. The plaintiffs essentially claimed that the installation exceeded the scope of the rights-of-way and thus constituted unjust enrichment and trespass for which they sought injunctive relief and damages. *Nudell* at *1. The plaintiffs sought to certify a class of landowners in all the states of the Eighth and Tenth Circuits, some 12 states in all. *Id.*

The *Nudell* Court essentially followed *Chambers* and found that the class definition necessitated a determination of the merits of the action and also depended on resolution of "many predicate factual issues related, at least in part, to the ultimate questions in the case." *Id.* at *3. Specifically, the court in *Nudell* found that the class definition required a title examination to ensure that each class member's ownership was sufficient (*i.e.*, a fee simple interest) to support the class claims. And, even though the class definition did not require consent, the court ruled that those who did consent would necessarily be excluded from the class and the consent issue required individualized review. Finally, the circumstances in that action required the court to determine whether fiber optic cable was in fact placed on the land at issue.

None of the inquiries that ostensibly required individual determination in *Nudell* prevent class certification in this action. More importantly, it is questionable whether a class could ever be certified under the *Chambers* and *Nudell* analysis. Every class requires some individualized inquiry to determine class membership. A person could not, for instance, walk into the district court clerk's office after a class action had settled, state simply that he or she is a class member, and then walk out with a share of the settlement proceeds. Some proof is of course required. Moreover, in any class action involving land ownership, the threshold question of class membership will likely relate, at least in part, to the ultimate questions in the case because a person without property rights, in addition to failing to establish class membership, will fail to establish an element of the claim. In a trespass action, for example, a potential class member will have to establish both land ownership and that the defendant entered the land as prerequisites to class membership, while both facts are also necessary for success on the ultimate liability issue. But where, as here, the defendant admittedly has performed the challenged acts on specific, identifiable property owned by others, these issues are purely a matter of claims administration—identifying the particular individuals who own or owned the identifiable property. This inquiry is by nature individual and no doubt will be a significant one, but it is certainly manageable and addressable through the application of purely objective criteria. The rule of *Chambers* and *Nudell* is essentially that class actions are unavailable in actions for trespass, even where the conduct allegedly constituting trespass is admitted and is common for every potential class member. There is no indication that Congress intended to omit trespass claims from the auspices of Rule 23, and it would be truly ironical to construe Rule 23 to mean that an entity that commits trespass is exempt from liability so long as it harms a large enough number of persons (each to an extent that does not exceed the costs of individual litigation) that notice and management will present some degree of complexity.

Whatever the propriety of the *Chambers* and *Nudell* analysis given the circumstances and class definitions there at issue, those decisions do not present an approach to class certification that is appropriate in this action largely because the legal questions necessary to resolve the dispute involved here do not turn on so many individual questions that the class is inordinately difficult to ascertain or that the Named Plaintiffs' claims are rendered atypical of the class. Furthermore, the common questions respecting the scope

of the limited categories of easement language predominate over any individual inquiries necessary to accomplish notice and claims administration.

### E. *Hallaba*

In *Hallaba v. Worldcom Network Services, Inc.,* 196 F.R.D. 630 (N.D.Ok.2000), the plaintiff owned land burdened by a railroad easement within which the defendant had installed fiber optic cable. Hallaba asserted claims of continuing trespass, unjust enrichment and fraud alleging that the defendants had installed the fiber optic cable without his permission and that the installation went beyond the scope of the railroad easements. *Id.* at 634. Hallaba moved the court to certify a nationwide class of landowners on whose property the defendants had installed fiber optic cable pursuant to railroad and pipeline easements without landowner permission. *Id.* The court eschewed any analysis under Rule 23(b)(2) and ultimately determined that the proposed class did not meet the Rule 23(b)(3) predominance and superiority requirements.

With respect to predominance, the court first addressed the defendants' common course of conduct surrounding the installation and operation of the offending fiber optic network, and concluded that a party's conduct is only relevant for purposes of the commonality and predominance inquiries when that conduct is both legally significant and affects each of the potential class members similarly. Applying that standard, the court concluded that a finding on commonality and predominance required a preliminary legal inquiry into each party's property rights to determine whether the defendants' conduct was relevant to the asserted claims. In conducting that preliminary inquiry, the court determined whether there were predominant common questions of law with respect to the property rights that each party held, and concluded that:

> Plaintiff's causes of action raise two separate legal questions related to land ownership: first, what interest do the railroad, pipeline, and class members have in the

right of way land in question, and second, if the railroad or pipeline only has an easement over the land, whether the scope of that easement allows it to lease part of the right of way to Defendants. While these two general questions may be common to the class, this alone does not suffice to meet the commonality requirements because states may have different legal standards for answering these questions.

*Id.* at 636–37.

On the latter point, the court found that the legal standards were not uniform because the railroad's property interests (fee, limited fee, easement, etc.) differed across the class, and from state to state;[6] and, that, in those cases where the railroad's interest was an easement, there were "distinct and numerous differences in the various state laws governing conveyances to railroads and the scope of easements." *Id.* at 640. As a result, the court concluded that "[t]he differences in state laws and the fact-intensive review of each deed necessary to establish ownership interests combine to preclude a finding of predominance and superiority under Rule 23(b)(3). Simply stated, the individual issues in this case substantially outweigh the common ones." *Id.* at 640.

The legal questions presented in this action differ markedly from those in *Hallaba* in both kind and degree. For one, there is no question in this action respecting the type of property interest that VEPCO holds. In each case, it is an express easement. True, in this action, as in *Hallaba,* it is necessary to determine the scope of each easement. Unlike *Hallaba,* however, easement scope is a question common for each identified easement category and that question will not require this Court to apply distinct and numerous legal standards from over 40 States. Here, the law of only two states comes into play and, as revealed in other proceedings in this action, there appears to be little difference in the law of easements in those two States.

Most telling is the *Hallaba* Court's statement that "[t]he heart of the Plaintiff's case

---

**6.** *Id.* at 637 ("deeds involving conveyances to railroads pose special problems that defy the general application of a single controlling legal principle for their interpretation.").

involves determination of the land ownership interest *of each class member."* *Id.* at 640 (emphasis added). Here, in contrast, the heart of the Plaintiffs' case requires the Court to determine the land ownership interest *of the Defendants,* a determination that is common for each category of legally indistinguishable easement language involved in the proposed class. Although the claims administration process will ultimately require each potential class member to establish land ownership, that individualized inquiry is minor in comparison to ultimate and dispositive common legal questions respecting easement scope.

In sum, the *Hallaba* decision denying class certification was highly dependent on the nationwide scope of the requested class and the multifarious property interests that arose from the various types of conveyances, for which the Court had no categorization or representative sample and which were subject to numerous and varying state laws. None of the problems confronting the *Hallaba* court are present in this action.

### F. *Moore*

In *Moore v. United States,* 41 Fed.Cl. 394 (1998), the plaintiffs, who owned land burdened by railroad rights-of-way, challenged federal legislation that converted the rights-of-way into public recreational trails. The plaintiffs challenged the legislation under the Fifth Amendment takings clause and they sought to certify a class of over 2000 landowners who owned property along the newly formed Katy Trail in Missouri. *Id.* at 396. The court granted the motion for certification for a number of reasons that are applicable here.

First, the court found that, although the 2000–plus class members was a large group, it was manageable because the class consisted of readily identifiable private landowners in a defined geographic area, which created a situation amenable to providing notice. Second, there was a common question of law because the basic legal issue, whether the federal legislation worked a Fifth Amendment taking, was the same for all class members. Moreover, the court noted that it was likely that the defendant would present common defenses applicable to all potential class members.

Third, although the court was troubled that numerous original grants to the railroad defined the property interests at stake and it was necessary to determine the nature and scope of each interest thus conveyed, the plaintiffs had furnished a representative sampling of the conveyances at issue, which indicated that the variants were limited. Based on the sample of deeds furnished, the court found it unlikely that the limited variants would spawn any "significant amount of piecemeal review" and, therefore, the common issues predominated over the individual. *Id.* at 398–99. Although the court also concluded that the damages computation would be "necessarily individualized," that did not defeat predominance because the computation "should be relatively formulaic." *Id.* at 399.

Each of these findings applies equally in this action. All the potential class members now own, or did previously own, land within a limited geographic area that is readily identified by the presence of VEPCO's OPGW as depicted in the maps and profiles that VEPCO provided during discovery. As further explained below the legal claims and applicable law are common across the class and the Defendants have made quite clear their intention to assert a common defense against all potential class members—that the easement language and the doctrine of apportionability give them the right to install and operate a commercial fiber optic network on all the relevant easements. And, although there are over 2,000 separate grants at issue in this action, the Plaintiffs have not only provided a representative sampling of conveyances, they have also reviewed and catalogued each of the over 4,000 right-of-way documents that the Defendants produced and have provided a sufficient basis for the Court to conclude preliminarily that the number of variants is limited. As was true of the class representatives in *Moore,* the Named Plaintiffs here are typical of all potential class members in that they own land that underlies VEPCO's OPGW. And, like the defendant in *Moore,* VEPCO has acted on grounds applicable to the whole

class because there is no evidence that it treated any private landowners individually when it installed and began to operate the fiber optic network for commercial telecommunications purposes.

### G. *Uhl*

In *Uhl v. Thoroughbred Technology and Telecommunications, Inc.*, No. IP 00–1232–C–B/S, 2001 WL 987840 (S.D.Ind. Aug.28, 2001) (*"Uhl I"*), the plaintiffs owned land abutting several thousand miles of railroad tracks. The defendant, T–Cubed, had installed fiber optic cable along and under the railroad rights-of-way, and the plaintiffs alleged that this action constituted trespass and slander of title and they also sought declaratory and injunctive relief. *Id.* at *1. The parties ultimately reached a settlement and the plaintiffs sought to certify a settlement class of 58,000 similarly situated landowners. *Id.* The court noted that "[i]n many instances, title to the properties—many subject to various conveyances over more than one hundred years—will be extremely difficult to prove," but nevertheless found that the class was maintainable under both Rule 23(b)(2) and (b)(3).

With respect to the Rule 23(a) prerequisites, the court found that, with 58,000 potential class members, the class easily satisfied the numerosity requirement. *Id.* at *6. As to commonality, the Court found:

> Several legal issues are common to all members, for example: the nature of the property interests that the landowners conveyed to [the railroad]; whether [the railroad], in turn, had sufficient title to convey an interest to T–Cubed; and, ultimately, whether T–Cubed's property interest is sufficient as against the property owners. Similarly, all class members face the same legal issues with respect to their causes of action: whether T–Cubed's conduct constitutes either trespass or slander of title. There are also common issues of fact incident to each of the legal issues, such as: whether T–Cubed announced its intention to its lay cable; whether T Cubed knew that its title was not good; whether T–Cubed had any interest at all in

the properties; and whether T–Cubed trespassed on the land.

*Id.* Most of these indicia of commonality are also present in the present action. In *Uhl* the nature of property interests conveyed was a common legal question necessitating resolution, whereas here, the nature of the property interest conveyed is a common fact—all of VEPCO's rights-of-way at issue are in the nature of express easements. And, like *Uhl,* the class members here all face common legal issues respecting: whether VEPCO had sufficient property interests to operate a commercial fiber optic network for telecommunications purposes; whether VEPCO had sufficient property rights to lease excess capacity to DTel; and, whether VEPCO's conduct constitutes trespass. Further, like *Uhl,* there is a common fact incident to the legal issues: whether VEPCO knew that it did not have the right to operate the fiber optic network for commercial telecommunications purposes.

With respect to typicality, the court in *Uhl* found that:

> "[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." [*In re Prudential Ins. Co. of Amer. Sales Practices Litigation,* 148 F.3d 283, 311 (3d Cir.1998), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).]

> Here, named plaintiff Elzinga shares with all class members: (1) the same factual allegations as to T–Cubed's wrongdoing; (2) the same legal claims for slander of title, declaratory and injunctive relief, and trespass; and (3) the same interest in proving T–Cubed's liability.

*Id.* at *7. Similarly, the Named Plaintiffs in this action share with the potential class members the same factual allegations as to the Defendants' wrongdoing, the same legal claims, and the same interest in proving the Defendants' liability.

In finding that the class met the Rule 23(b)(2) requirements, the court concluded that T–Cubed had "refused to act on grounds generally applicable to the Class by refusing

to pay compensation to the individual landowners for the use of their land for commercial purposes" and that T–Cubed justified its conduct by pointing to the rights-of-way, a defense that it asserted against all class members. *Id.* at *8. Again, the same is true here. Although the *Uhl* class sought damages in addition to injunctive and declaratory relief, Rule 23(b)(2) remained available because there was clear and comprehensive notice to the class members, who had the right to opt out.

The *Uhl* class also met the Rule 23(b)(3) predominance and superiority requirements. Here, as in *Uhl:*

> the entire case arises from a common nucleus of operative facts: [VEPCO's] course of conduct of ignoring the interests of the individual property owners and asserting its right to lay its cable in the corridors at issue. All class members have been harmed by [VEPCO's] course of conduct, varying only to the extent that their parcels vary in size. The law of . . . trespass in the [two] different states in which the [class land is located] is sufficiently similar as to have no adverse impact on the commonality of the issues of fact.

*Id.* at *9.

On appeal, the Seventh Circuit upheld the district court's settlement class certification even though "all parties admit[ted] that in many cases, title to the properties w[ould] be difficult to prove." *Uhl v. Thoroughbred Technology and Telecommunications, Inc.,* 309 F.3d 978, 981 (2002) ("*Uhl II*"). Although the *Uhl* decisions involved a settlement class, rather than a litigation class, both courts strictly applied Rule 23. As the Seventh Circuit explained:

> In *Amchem,* 521 U.S. at 619, 117 S.Ct. 2231, and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 828 n. 6, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), the Supreme Court emphasized that although settlement is relevant to class certification, the requirements of Rule 23 must still be satisfied. Thus, a district court may not abandon the Federal Rules merely because a settlement seems fair, or even if the settlement is a "good deal." In some ways, the Rule 23 requirements may be even more important

for settlement classes, for which (as this court has put it), the district court must act almost as a fiduciary of the class when approving settlements. *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir.2002).

*Id.* at 985.

Mindful of these decisions and their teachings, it is appropriate now to apply the precepts of Rule 23 to this action.

## III. Applying Rule 23 In This Action

The preceding review of similar federal decisions reflects that class certification is here appropriate. Application of Rule 23 to the circumstances of this action follows.

### A. Rule 23(a)

#### 1. Commonality

■ Each of the potential class members will proceed under the same legal theory and present a common legal question for resolution and there is but one common set of material facts necessary to establish liability. With respect to the common questions of law, it is manifest that all potential class members will need a declaratory judgment respecting the meaning of the applicable easements and then, if that is resolved in their favor, they will assert the same claims—trespass and unjust enrichment. Each claim thus turns on the same legal theory—that the subject easements are, by their express terms, of limited scope and that the Defendants have knowingly used the easements in a manner that exceeds that scope. The law applicable to these claims comes from two distinct jurisdictions, North Carolina and Virginia, but the record does not reflect any appreciable substantive differences between the two bodies of law as they relate to the issues for resolution in this action.

Common questions of fact here abound, and many are undisputed. For instance, each potential class member's claims implicate the following undisputed facts: (1) VEPCO replaced static wire on certain of its preexisting facilities with OPGW; (2) VEPCO leased excess fiber optic network capacity to DTel; (3) the Defendants are

operating a commercial fiber optic network for telecommunications purposes unrelated to supplying electric power.

The Defendants sharply dispute the allegations that, although VEPCO knew the easements were limited in scope to providing electricity, it proceeded to use the easements for commercial telecommunication purposes because it had determined that it was too costly to obtain additional easement rights from the landowners. Nevertheless, the facts necessary to prove this alleged conduct are identical for each class member and are relevant to each class member's damages. Indeed, the Defendants do not deny that the contested facts surrounding their alleged conduct are common to each class member. Instead, the Defendants argue that the Plaintiffs fail to meet the commonality requirement because the common issue of VEPCO's conduct is relevant to only a "tiny part" of the Plaintiffs' case. This conclusion results from an analysis that merges the Rule 23(a)(2) commonality analysis with the Rule 23(b)(3) predominance analysis. As the authority upon which the Defendants rely reflects, however, although predominance suffices to show commonality, the lack of predominance does not suffice to show lack of commonality. *Central Wesleyan*, 143 F.R.D. at 636. Rather, those actions where commonality is present are a subset of those cases where predominance is present.

In *Hallaba*, for example, the court explained that "[t]he predominance requirement in Rule 23(b)(3) is a more stringent standard of commonality than that in Rule 23(a)(2), and therefore any plaintiff who meets the predominance test will necessarily satisfy the Rule 23(a) commonality test. Accordingly the Court will review commonality and predominance together." *Hallaba*, 196 F.R.D. at 635. Thus, the Court chose to conflate the Rule 23(a) commonality requirement with the Rule 23(b)(3) predominance requirement, an analytical approach that is inappropriate where, as here, a court must also determine whether to certify the action under Rule 23(b)(2). Although one may satisfy the commonality requirement by showing that common issues predominate, *see Amchem*, 521 U.S. at 609, 117 S.Ct. 2231, this

operation is not commutative. *See Central Wesleyan*, 143 F.R.D. at 636 (explaining that 23(a)(2) does not require that the common issues predominate). Because the Plaintiffs here also seek certification under Rule 23(b)(2), which has no predominance requirement, it is necessary to analyze the commonality requirement separately. As the *Hallaba* court recognized, "[t]o satisfy Rule 23(a)(2), Plaintiff need not show that all facts or legal issues are common to the class. Rather he 'must demonstrate that there is at least one question of law or fact common to the class.'" *Hallaba*, 196 F.R.D. at 635 (quoting *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir.1999)). Thus, the commonality standard is "fairly easily met" and the Plaintiffs here have met their burden. *Hallaba*, 196 F.R.D. at 635.

Defendants also erroneously rely on the decision in *Ostler* where the Court ultimately concluded that a defendant's common course of conduct "is not sufficient to sustain a class **under Rule 23(b)(3)**" where class members' rights "depend on such extensive individual legal and factual determinations." *Ostler*, 2002 WL 31040337 at *7 (emphasis added). The court nonetheless found that the proposed class "satisfie[d] the commonality requirements **under Rule 23(a)(2)**" because the plaintiffs had come forward with evidence that the defendants had "engaged in a common course of conduct directed toward all of the potential class members." *Ostler*, 2002 WL 31040337 at *3–4 (emphasis added) (finding also that common issues of law would be present because "potential class members would be asserting the same causes of action.").

In sum, the Plaintiffs have alleged a disputed question of fact common to the potential class members—the Defendants' course of conduct. *See Central Wesleyan*, 143 F.R.D. at 636 (finding the commonality requirement met where the Defendant acted in a common way toward the class). The Defendants' arguments to the contrary are improperly directed towards the predominance requirement and are pregnant with an admission that the alleged common course of conduct is indeed relevant to at least some portion of the Plaintiffs' case. In addition,

each of the undisputed facts respecting the Defendants' installation and operation of the fiber optic network are likewise common to the entire class. Moreover, the Plaintiffs request permanent injunctive relief and "suits for injunctive relief by their very nature present common questions of law or fact." *McGlothlin v. Connors*, 142 F.R.D. 626, 633 (W.D.Va.1992). For all of these reasons, this action satisfies the commonality requirement.

### 2. Typicality

 Typicality is present here because the Named Plaintiffs present legal and factual claims common across the potential class, because they will have to prove the same elements as the remainder of the class, and because, as the Summary Judgment Appendix and Class Certification Appendix reflect, the factual differences among the potential class members are minor with respect to the primary legal question for resolution. *Brown*, 92 F.R.D. at 32. Citing *Broussard*, the Defendants argue the Named Plaintiffs' claims are not typical because they cannot advance a single claim for trespass, resulting from actions allegedly exceeding the scope of the subject easements, on the basis of multiple different easement documents.

It is true that, in *Broussard*, the Fourth Circuit stated that the "plaintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts." *Broussard*, 155 F.3d at 340. In that decision, however, the contracts contained "*materially* different contract language," "the actual contractual undertaking of each [class member] was subject to *several critical variables*," and a number of contracts raised "a *wholly distinct* set of interpretive issues." *Broussard*, 155 F.3d at 340 (emphasis added). The Court of Appeals found that the district court's decision to certify had allowed the plaintiffs to "stitch together the strongest contract case based on language from various [contracts], with no necessary connection to their own contract rights." *Broussard*, 155 F.3d at 344.

Here, the Plaintiffs have met their burden to establish that the various easement documents are addressable on a representative basis. The Summary Judgment Appendix and Class Action Appendix provide a categorical basis for determining easement scope based on the purpose clause in the easements and there is no evidence that the easements within each category will differ in any material respects as did the contracts at issue in *Broussard*. And, to the extent further analysis reveals that additional easement language will determine easement scope, it appears likely that such additional language is also amenable to categorization and resolution in representative fashion. There is simply no evidence that the over 2000 easements at issue will require 2000 or even 200 individual adjudications. And, in any event, "[w]here the class representative's claims are such that they will have to prove the same elements as the remainder of the class, then typicality should be found notwithstanding factual differences between the various members of the class." *Brown*, 92 F.R.D. at 38; 1 A. Conte & H. Newberg, Newberg On Class Actions § 3:13 (hereafter H. Newberg). Although all the easement grants are not identical, determining whether the purpose clause in the Named Plaintiff's easements permits the Defendants' fiber optic network will, in all probability, be relevant to most, if not all, class members in pursuing trespass claims with respect to their easements. *See Coca–Cola Bottling Co. v. Coca–Cola Co.*, 98 F.R.D. 254, 265–68 (D.Del.1983) (granting certification on the issue of certain contractual provisions that were commonly derived, at least in part, from a series of previously entered consent decrees).

### 3. Adequacy of Representation

 Although there is no assertion that the Named Plaintiffs' claims conflict with any class claims on the issue of liability, the Defendants contend that there is a conflict between the class representatives and the potential class members respecting the dollar-per-foot approach to measuring damages. Of course, a conflict between the class representatives and the class members respecting the appropriate relief may preclude class certification on the issue of damages. *Broussard*, 155 F.3d at 337. Thus, that issue now requires attention.

The easements that underlay the 695 miles of VEPCO's transmission corridors burden land that varies greatly in character, from rural farmland to dense urban areas. The Named Plaintiffs propose to measure each class member's damages by multiplying the per foot value of the fiber optic corridor with the number of feet that cross that class member's property. They contend that, under North Carolina and Virginia law, the appropriate measure of damages for unjust enrichment obtained through trespass is the value that the trespasser obtained through its unlawful use of the land, *i.e.*, the price the trespasser would fairly have been required to pay to use the land legally. (Reply at 23–24) (citing *Raven Red Ash Coal Co. v. Ball*, 185 Va. 534, 39 S.E.2d 231 (1946); *Leigh v. Garysburg Mfg. Co.*, 132 N.C. 167, 43 S.E. 632 (1903); *Singleton v. Haywood Electric Membership Corp.*, 151 N.C.App. 197, 565 S.E.2d 234 (2002)). The Named Plaintiffs further contend that documents obtained from the Defendants in discovery will show that the Defendants have, in the past, valued the easements underlying the OPGW on a dollar-per-foot basis, both in determining the price to charge a prospective lessee and during settlement discussions respecting a previous litigation over the right to install OPGW on certain lands.

The Defendants point out that the dollar-per-foot measure will favor class members, such as the Tomlinsons and Fishers, who own large tracts of rural land at the expense of those who own smaller, but qualitatively more valuable, real estate in densely populated areas. The Defendants have submitted evidence that the Named Plaintiffs' property is among the most rural, least developed, least intensively used, and least valuable land in the potential class. (Johnson Decl. § V; Tesh Decl. at 13). The Defendants also assert that, because network traffic differs on different OPGW segments, the value that the Defendants derive from OPGW overhanging land in a high tech corridor, for example, would differ from the benefit derived from OPGW cable overhanging swampland.

The Named Plaintiffs reply that "the valuation at issue in this case does not depend on the real estate value of the properties underlying [the] Defendants' fiber optic network." (Reply at 37). According to the Named Plaintiffs, the OPGW over any particular foot of land constitutes a crucial link in the network and therefore generates the same amount of revenue as any other foot. Similarly, they say that the class land has uniform rental value as a telecommunications corridor.

Class members with small, yet highly valuable, urban real estate may, however, take a different view. The Defendants have pointed out that, under the Named Plaintiffs' damages theory, class members with large rural tracts of land, such as the Named Plaintiffs, will obtain a larger sum than class members owning small urban tracts and that none of the Named Plaintiffs represent the interests of such urban class members, who may desire a damage measure tethered directly to the real value of the servient land.

It may well be true that the per foot mode of valuing the value of the easement is the accepted, and perhaps only fair, way to calculate damages. Nevertheless, there is some possibility that a different, more individualized measure of damages may obtain. In such an eventuality, although the Named Plaintiffs may adequately represent the class on the issue of liability,[7] they may not adequately represent the class on the issue of damages should divergent interests materialize. This is so even if, as the Named Plaintiffs assert, a damages measure based on real properly values may be accomplished by categorizing the types of properties for appraisal purposes in a trail on damages, as was done in *Moore v. United States*, 54 Fed.Cl. 747 (2002) and as the Named Plaintiffs' counsel assert they are currently attempting to accomplish in *Bywaters v. United States*, 196 F.R.D. 458 (E.D.Tex.2000) and *Schmitt v. United States*, 203 F.R.D. 387 (S.D.Ind.2001). As such it is appropriate to allow potential

---

7. To the extent that Defendants have raised a challenge to the Named Plaintiffs' standing, the Court declines to address that issue because "the certification stage is an inappropriate time to make any determination as to plaintiffs' standing to represent the putative class." *Brown*, 92 F.R.D. at 37.

class members to opt out on the issue of damages.

### B. Rule 23(b)(2)

■ The Plaintiffs seek damages in the form of: (1) an accounting from DTel of all sums it received as a result of its trespass; (2) an accounting from VEPCO of all sums it received under agreements authorizing the use of the class land for purposes unrelated to electricity transmission; (3) the reasonable value of the Defendants' improper use of the class land or, alternatively, all revenue arising from the Defendants' trespass and/or title to the fiber optic cable; (4) all sums the Defendants received that flow from the unlawful or improper use of class land; and, (5) punitive damages. Each category of damages flows directly from, and is entirely dependent upon, the requested declaratory and injunctive relief, which essentially seek a ruling that the Defendants "have no right to construct and operate [a] fiber optic network [on the class land] for purposes unrelated to the transmission of electricity," (Am. Compl.¶ 42) and that the Defendants have "no legal right or interest in the [class land] beyond the limited purpose of transmitting electricity," (Am.Compl.¶ 43). If the Defendants are liable to the class as a whole on the claims that form the basis of the injunctive and declaratory relief, damages would not necessitate any individual hearings on the merits of any individual class member's case. To the extent that any damages depend on a finding that the Defendants have been unjustly enriched, the allegations in this regard stem from their conduct with respect to the class as a whole, and do not arise from their particular conduct as respects any class member as an individual. Nevertheless, if the dollar-per-foot approach is not a measure of damages agreeable to all class members, there is a potential need for individual land valuations. In such an eventuality, the damages would no longer be merely incidental to the claims for declaratory and injunctive relief.

The Rule 23(a) requirements have been met and certification under Rule 23(b)(2) is proper because the Defendants have acted on grounds generally applicable to the class, but there is some question whether the requested damages are incidental to the requested injunctive and declaratory relief. In this circumstance, Rule 23(c)(2)(A) vests the court with discretion to grant composite certification, that is, to certify the class under 23(b)(2) on the liability issues but to provide class members with Rule 23(c)(2)(B) notice and to allow them to opt out on the damages issues. That is the approach that best serves the ends of justice in this action.

### C. Rule 23(b)(3)

As previously explained, where certification is proper under both subsection (b)(2) and subsection (b)(3), a court should certify under (b)(2), *In re A.H. Robins,* 880 F.2d at 728. Nevertheless, it is preferable to additionally determine whether certification is available under subsection (b)(3) in the event that certification under (b)(2) proves inappropriate or unworkable. To that end, it is necessary to assess whether common questions of law and fact predominate over issues that affect individual numbers and to assess whether "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Rule 23(b)(3).

### 1. Predominance

■ As previously explained, the easement grants at issue are amenable to categorical treatment and easement scope is the determinative question in this action. This, in conjunction with the common questions of law governing the Plaintiffs' claims and the common disputed and undisputed questions of fact surrounding the Defendants' conduct, suffices to overcome any individual issues respecting class identification, notice and claims administration, which in this action are addressable through purely objective criteria. And, although certain aspects of the easement grants may have varied, the assertion that the commercial fiber optic network exceeds the express scope of the easements is common to all class members and, so far as is ascertainable prior to a determination on the merits, predominates over any individual differences that may exist among the easement grants. *See Durant v. Servicemaster Co. TruGreen, Inc.,* 208 F.R.D. 228, 233

(E.D.Mich.2002); *see also Kleiner v. First Nat. Bank,* 97 F.R.D. 683, 694–95 (N.D.Ga. 1983) ("And at this point the fact that not all contracts are identical is not sufficient to overcome the apparent commonality of issues that they present."). Although there is some potential that individual issues may arise solely on the issue of damages, the fact that damages will differ among class members does not defeat the finding of predominance if liability is common to the class. *Jeffreys,* 212 F.R.D. at 323.

### 2. Superiority

■ The Defendants assert that, in this matter, a class action is not superior to allowing each potential class member to pursue his or her claims individually. Given the efficiency gains that will result from a resolving the predominant common issues on a representative basis, the Defendants' position is not tenable.

The Defendants also assert that the class membership is not manageable because title searches and land surveys will be necessary to determine who owned the easement land throughout the period that the OPGW has been in place and to determine which easements, and which land, contain the offending OPGW. As a result, say the Defendants, the class cannot be identified or notified within a reasonable time period.

Manageability is but one of the factors under Rule 23(b)(3) and:

> should be considered only in relation to alternative means of adjudication and thus should not be used to deny certification in the fact of novel challenges, but "only where the attention and resources which would have to be devoted strictly to administrative matters will overwhelm any relief ultimately accruing to the plaintiff class, can difficulties in management support denial of class certification under 23(b)(3)."

*Brown,* 92 F.R.D. at 49 (quoting 3B Moore's Federal Practice P 23.45(4.–4) (2d Ed.1980)). Here, although class identification, notice and claims administration may present some problems, the class consists only of those persons who owned a portion of a geographically limited and identifiable section of property during a relatively short and ascertain-able time period. In these circumstances, and given the magnitude of the potential relief should the Plaintiffs succeed, the inquiry is not likely to overwhelm any relief ultimately accruing to the class. Furthermore, these determinations are unlikely to require the Court's participation to an extensive degree.

And, if the class members cannot be identified and individually notified through reasonable effort, a court may exercise its discretion to provide the best notice practicable under the circumstances. Fed.R.Civ.P. 23(c)(2)(B); *In re Domestic Air Transport. Antitrust Litigation,* 141 F.R.D. 534, 539 (N.D.Ga.1992). What amounts to reasonable efforts under the circumstances is for the court to determine after examining the available information and possible identification methods. *Id.* at 539. " 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.' " *Id.* at 547 (quoting *In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1099 (5th Cir.1977)). Thus, if Defendants are correct that identifying each individual class member will require a title search and survey and that such cannot possibly be accomplished within a reasonable time, the appropriate remedy in that eventuality will be to provide the most reasonable, alternate form of notice. The Court, therefore, rejects the Defendants' assertions that the decision in *Fulcher v. United States,* 632 F.2d 278 (4th Cir.1980) (en banc), requires, as a matter of due process, a title search to effectuate individualized to notice to landowners in a class action.

Finally, with respect to the Defendants' insistence that the liability or damages aspects of this action will necessitate extensive title searches and surveys, "a district court should not decline to certify a class because it fears that insurmountable problems may later appear." *Windham,* 565 F.2d at 70. Although there is some evidence that these problems may arise, the Court does not perceive that they will occur with such frequency to constitute a serious impediment to certification. And, in contrast with the "mere assurances" of the plaintiffs in *Windham* that "some solution will be found," the Named Plaintiffs have provided an ample

basis from which to conclude that tools and data are available to address such an eventuality in an efficient manner.

With respect to the superiority requirement, the Defendants contend that each class member actually has an interest in opting out of the class and proceeding individually to assert a valuable hold-up right in a missing link in the fiber optic corridor. Furthermore, the Defendants contend that the punitive damages are capped at $350,000, which the class members would have to share, whereas a plaintiff proceeding as an individual could seek the maximum amount of punitive damages.[8] Certification under Rule 23(b)(3), however, would allow any potential class member with those goals in mind to opt out of the class, therefore, the Defendants' concerns respecting each individual class member's potential financial reward are well addressed.

The Defendants contend that the only alternative method for adjudication of the issues presented by the Amended Complaint is the case-by-case method. The truth, however, is that the case-by-case method is neither fair nor efficient. It would require two thousand people, perhaps more, to institute separate actions, and it would necessitate that VEPCO and DTel participate in each of those actions. The judicial resources required to adjudicate those actions would exceed significantly the resources required for class adjudication. And, it appears that the end result of the case-by-case approach urged by the Defendants would be that few landowners would proceed on their claims because the economic costs could significantly exceed the potential benefits. Such a result would be inconsistent with the purpose of Rule 23, which is "to achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without

sacrificing procedural fairness or bringing about other undesirable results." *Windham,* 565 F.2d at 68–69 (quotations omitted).

## CONCLUSION

The liability aspects of this action meet the requirements of Rule 23(a), are maintainable under either Rule 23(b)(2) or 23(b)(3), and may be certified under (b)(2) on the condition that resolution of easement scope does not require extensive individual adjudication. In other words, during the ensuing determination on the merits of this action, if it becomes evident that, under the applicable law, the individual variations among easement documents in the various easement categories are material to the issue of easement scope, it may become necessary to decertify the class, create subclasses, or otherwise alter or amend the certification order as may be appropriate before the decision on the merits. Should the inquiry into the merits affirm that any variations are immaterial and that the easement grants are addressable on a representative basis, it is nevertheless necessary, at least on the basis of the current record, to provide class members with Rule 23(c)(2)(B) notice and allow them to opt out on the issue of damages because there is a potential for reasonable conflicts among the class members on the appropriate measure of damages.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**8.** The Defendants cited no authority for the limitation that they assert. That is a serious omission where, as here, North Carolina law does not appear to impose a cap at all. It is unnecessary to address that issue now. Moreover, this case does not appear to be one that is driven by the prospect of recovering punitive damages.